**In The Matter of D. H. OVERMYER CO., INC. (OHIO) et al., Debtors.**

**Robert P. HERZOG, as Receiver of D. H. Overmyer Co., Inc. (Ohio), et al., Debtors, Plaintiff,**

v.

**BIRMINGHAM FIRE INSURANCE COMPANY, Jabco-Anrem Associates, Ltd., Midwest Roofing and Furnace Company, Earl E. Bright, Inc., The Overmyer Company, Inc., and American National Insurance Company, Defendants.**

**Bankruptcy No. 73 B 1129.**

United States Bankruptcy Court, S. D. New York.

March 31, 1982.

Finley, Kumble, Wagner, Heine, Grutman & Underberg, New York City, for consolidated debtors.

Booth, Lipton & Lipton, New York City, for receiver.

Hahn & Hessen, New York City, for creditors' committee.

Hansell, Post, Brandon & Dorsey, Atlanta, Ga., for Birmingham Fire Ins. Co.

Posner & Krasnow, New York City, for Midwest Roofing and Furnace Co.

Bricker, Evatt, Barton & Eckler, Columbus, Ohio, for Earl E. Bright, Inc.

## OPINION

JOEL LEWITTES, Bankruptcy Judge.

### I

### The Parties

Robert P. Herzog, as receiver[1] of the consolidated[2] Chapter XI[3] debtors, D. H. Overmyer Co., Inc. (Ohio) et al., has commenced an adversary proceeding against the above captioned defendants to determine the validity and extent of his interest in the proceeds of a check in the amount of $25,698.19 delivered to him by defendant Birmingham Fire Insurance Company ("Birmingham").

The defendants, who have appeared in this action are as follows:[4]

(1) The Overmyer Company, Inc. ("TOC"), the parent of the consolidated debtors and a debtor in separate arrangement proceedings pending in this Court under docket number 75 B 2427;

(2) D. H. Overmyer Co., Inc. of Ohio ("DHO [Ohio]"), a subsidiary of Overmyer and one of the consolidated debtors;

(3) D. H. Overmyer Co. Inc. of Georgia ("DHO [Georgia]"), a subsidiary of Overmyer and one of the consolidated debtors;

(4) Birmingham, a corporation organized under the laws of Pennsylvania with a principal place of business in New York;

(5) Midwest Roofing and Furnace Company ("Midwest") an Ohio corporation with its principal place of business in Ohio; and

(6) Earl E. Bright, Inc. ("Bright") apparently an Ohio corporation doing business in the state of its incorporation.

### II

### Underlying Facts

The plaintiff and the appearing defendants have stipulated to most of the operative facts. Those facts that have been contested, on consent of the parties, are to be decided upon the exhibits annexed to their stipulation.

This Court finds that on March 1, 1972 Birmingham issued its insurance policy No. 148–75–66 to Overmyer. That policy insured various properties against loss from, among other perils, windstorms, with a limit of $250,000 less a $2,500 deductible for each location issued. Such policy was cancelled effective December 31, 1973, for nonpayment of premiums.

One of the insured premises, a warehouse owned by DHO (Ohio), located in Columbus, Ohio, was damaged on May 10, 1973 and sustained damage in the amount of $32,422.19. Overmyer, on April 30, 1974, filed a claim for such loss, covered by the Birmingham policy, in the amount of $29,922.19 ($32,422.19 less the $2,500 deductible). It appears that necessary repairs to the warehouse were subsequently made by defendants Midwest & Bright.

Thereafter, on November 21, 1973, another location insured under Birmingham's policy, a warehouse leased by DHO (Georgia), sustained wind damage in the amount of $58,680. Overmyer filed a proof of loss for such claim in the amount of $56,180 ($58,680 less the $2,500 deductible).

Prior to the damage to the Georgia premises, but subsequent to the loss occasioned in connection with the Ohio property, Overmyer, and many of its subsidiaries, on November 16, 1973, filed petitions for arrange-

---

1. On or about December 5, 1973, upon application therefor, United States District Judge Dudley B. Bonsal, in accordance with former local Bankruptcy Rule 8(a) of this District, appointed Mr. Herzog receiver of the Overmyer Corporations.

2. The purpose and effect of a substantive consolidation of debtors have been noted in *Chemical Bank New York Trust Co. v. Kheel*, 369 F.2d 845 (2d Cir. 1966).

3. The consolidated cases, having been commenced on November 16, 1973, are governed by the terms and provisions of the Bankruptcy Act of 1898. *See* Bankruptcy Reform Act of 1978 § 403(a).

4. For reasons set forth, *infra*, defendant Jabco-Anrem Associates ("Jabco") has no interest in this proceeding and has not appeared. Defendant American National Insurance Company has not appeared, as well.

ment, in this Court, under Chapter XI of the 1898 Bankruptcy Act.

In accordance with the terms of Birmingham's policy issued to Overmyer, the latter agreed to pay Birmingham a maximum annual premium of $150,000. For the policy year, 1973, during which the two aforesaid windstorms occurred, Overmyer had made only a partial premium payment and thus, as of the date of the Chapter XI filings, the amount of unpaid premiums due and owing to Birmingham was $60,404.

On or about August 26, 1974, Birmingham delivered to the receiver, Herzog, a check in the sum of $25,698.19 made payable to "Robert E. Herzog, Receiver in Bankruptcy," "Roy Babitt, Referee in Bankruptcy,"[5] "The Overmyer Company, Inc.," "American National Insurance Co.," "Jabco Anrem Associates, Ltd.," "Jabco Anrem Associates" and "Midwest Roofing and Furnace Co." At the time of delivery of that check to the receiver by Birmingham, the latter filed proofs of claim, in the consolidated Chapter XI cases, totalling $60,606, the amount of the unpaid premiums.

Birmingham calculated the amount of the $25,698.19 check to the receiver by setting off the unpaid premiums of $60,404 against $86,102.19, the total claims of the two windstorm losses. Birmingham tendered that check in full satisfaction of all claims under its policy with Overmyer. That check was deposited by the receiver on September 4, 1974, in his operating account, by a stamped endorsement. There were no endorsements by any of the other named payees set forth on the check.

Prior to the receiver's deposit of that check and before it cleared, Jabco, Overmyer's landlord of the Georgia warehouse,

on August 27, 1974, filed suit against Birmingham in a Georgia state court seeking to recover, as a named insured under the policy, the *full amount* of the Georgia loss, $56,180.00. Neither the receiver nor Overmyer was made a party to that lawsuit.

Thereafter, on February 18, 1975, Birmingham commenced an action, which it styled as one in interpleader, in the United States District Court for the Northern District of Georgia, Atlanta Division. Birmingham, in that action, named Jabco, Midwest and the receiver as defendants, but not Overmyer. Jabco, asserted a counterclaim for the amount of damage to the Georgia warehouse.

The District Court, by order dated November 7, 1975, dismissed Birmingham's "interpleader" action and granted partial summary judgment to Jabco on its counterclaim ruling that Birmingham did not have the right to setoff unpaid premiums against Jabco's loss in the event Jabco was otherwise entitled to recover against Birmingham.[6]

Thereafter, by order dated February 23, 1976, the District Court, after reciting that Birmingham and Jabco "have settled this matter between themselves" and "consent to the entry of this order", dismissed, with prejudice all claims by Birmingham against Jabco, all claims by Jabco against Birmingham "and to the extent that there may be any remaining claims not previously disposed of by an earlier ruling of this Court [the order of November 7, 1975] such remaining claims are dismissed without prejudice."[7]

With respect to the remaining defendants[8] Midwest and Bright, we find the following facts:

5. At the time the check was issued, Hon. Roy Babitt presided over the instant Chapter XI cases.

6. The District Court order did not "intimate on the propriety of an interpleader action in Ohio with Midwest and Bright as defendant claimants." No mention, whatsoever was made of the receiver and, as noted earlier, Overmyer was not named in Birmingham's "interpleader" action.

7. One of the claims not determined by the Court's order of November 7, 1975 was whether the Certificate of Insurance delivered to Jabco adding Jabco as an additional insured was executed by an agent of Birmingham with authority to bind the insurer.

8. It appears that the receiver's legal position, upon the filing of his amended complaint, corresponded with that of the consolidated debtors and of TOC, which is merely a nominally named defendant. *See* Transcript of Hearing

On May 6, 1976, Midwest instituted an action against the receiver in the civil court of the City of New York for the sum of $5,147 in connection with work performed by it in repairing the windstorm damage to the Overmyer warehouse in Ohio. Midwest, although a named payee on the check is concededly not an additional named insured under the policy.

Defendant Bright asserted a claim of $24,707 against the proceeds of the check issued by Birmingham to the receiver for labor, material and equipment furnished by it in repairing the windstorm damage to the Ohio warehouse owned by Overmyer. Bright, although a payee on the check is admittedly not an additional named insured under the policy.

### III

*Discussion*

### A

*Birmingham's Claims Against The Receiver, DHO Defendants and TOC*

(a)

*Conversion*

Birmingham seeks recovery from the receiver of the proceeds of the $25,698.19 check it issued which named several joint payees. It is Birmingham's contention that the receiver, by cashing the check issued by Birmingham, without obtaining the endorsements of his joint payees, is liable to Birmingham for conversion.[9]

Although conversion contemplates the "disposition of the property of another, without right, as if it were [one's] own",[10] in order to "establish a cause of action in conversion, a plaintiff must show it has an immediate and superior right to possession of the allegedly converted material."[11] Accordingly, for Birmingham to prevail on its claim of conversion, it must demonstrate that, as against the receiver, it has a superior right to possess the proceeds of the check.

It has been noted that

"Inquiries to leading ... insurance companies disclose substantial commercial use of negotiable instruments payable to joint payees. Instruments payable 'to the order of A and B' are usually employed when the drawer intends to pass consideration to the named payees jointly...."[12]

"The purposes which the companies hope to achieve by executing instruments in this fashion are primarily these: (1) to discharge the obligation to all parties on the policy and yet leave it to the parties to make their own proportionate division—an informal type of interpleader which eliminates the company from haggling over amounts due each; (2) to assist lien holders in the collection of their claims against the proceeds; and (3) to simplify internal bookkeeping processes of the companies as an incidental matter."[13]

Since the purpose here, as well, was, *inter alia*, to discharge Birmingham's obligation to all parties on the policy,[14] it is clear that Birmingham, as drawer, in the absence of a

December 19, 1977 pp. 12–13 before Babitt, B. J. Accordingly, the Receiver's and TOC's stances here are expressed, expounded, and represented by the consolidated debtors' submissions.

9. Under the law of New York, "a check is representative of money and can be the subject of an action in trover or conversion." *470 West End Avenue Corp. v. East River Savings Bank*, 102 Misc.2d 1024, 1026, 424 N.Y.S.2d 859 (Civ.Ct.N.Y.Co.1980) (cases cited).

10. *United States v. Santiago*, 528 F.2d 1130, 1135 (2d Cir.), *cert. denied, sub nom. Santiago v. United States*, 425 U.S. 972, 96 S.Ct. 2169, 48 L.Ed.2d 795 (1976) *quoted in Wabco Trade Co.

v. S.S. Inger Skou*, 482 F.Supp. 444, 448 (S.D.N.Y.1979). See also 2 Anderson, Uniform Commercial Code § 3–419:4 at 1034 (1971).

11. *Marcraft Recreation Corp. v. Frances Devlin Co.*, 459 F.Supp. 195, 197 (S.D.N.Y.1978) *citing Independence Discount Corp. v. Bressner*, 47 A.D.2d 756, 365 N.Y.S.2d 44 (2d Dept. 1975).

12. Note, *Discharge of Joint—Payee Instruments*, 1 Stan.L.Rev. 730, 738 (1948).

13. *Id.*

14. *See* Transcript of Hearing, December 19, 1977 p. 40 before Babitt, B. J.

contractual agreement to the contrary,[14a] no longer can claim any rights or possession to the proceeds payable to the joint payees.

In any event, it has been stated that "a negotiable instrument is the property of the holder or payee, not the drawer."[15] Since Birmingham has failed to demonstrate its right to immediate possession of the check, or its proceeds, a necessary prerequisite to establishing a claim for conversion, the receiver is not liable to Birmingham for conversion.[16]

### (b)

### *Unjust Enrichment*

It may be recalled that DHO (Ohio)'s warehouse suffered windstorm damage in the amount of $29,922.19 and DHO (Ga.) sustained similar damage to its leased warehouse in the amount of $56,180.[17] Further, the consolidated debtors owed its insurer, Birmingham, $60,404 in premiums. This left a sum of $25,698.19 which indeed was the amount of the check sent by Birmingham to the receiver made payable to several joint payees.

Birmingham maintains that the receiver, who by Court order displaced the consolidated debtors,[18] was unjustly enriched when he retained the proceeds of that check after Birmingham had payed over, in the Georgia United States District Court action, the sum of $56,180 plus interest and costs to Jabco, the landlord of Overmyer's Georgia warehouse, under Overmyer's insurance policy with Birmingham.

■ It has been noted that to recover for unjust enrichment, a plaintiff must demonstrate that "1) defendant was enriched; 2) that such enrichment was at the expense of the plaintiff; 3) that the circumstances were such that in equity and good conscience the defendant should make restitution."[19]

■ We see no basis for Birmingham's claim that the receiver or the consolidated debtors were enriched, let alone, unjustly enriched under the circumstances present here. As just stated, the check issued by Birmingham to the receiver represented payment for losses actually sustained by the two Overmyer warehouses less the premiums due Birmingham from the consolidated debtors. Since "[u]njust enrichment contemplates a situation where benefits are received by one party which, in fact, belong to another",[20] Birmingham has not alleged facts sufficient to support its claim for unjust enrichment.[21]

---

**14a.** *See e.g. R. T. Vagley, M.D. v. Lavitsky (In re Lavitsky)*, 11 B.R. 570, 571 (Bkrtcy.W.D.Pa. 1981).

**15.** *Commercial Credit Corp. v. University National Bank of Fort Collins*, 590 F.2d 849, 852 (10th Cir. 1979) *citing Stone & Webster Engineering Corp. v. First National Bank & Trust Co.*, 345 Mass. 1, 184 N.E.2d 358 (1962); *Life Insurance Co. of Virginia v. Snyder*, 141 N.J.Super. 539, 358 A.2d 859, 862 (1976). *Cf. Central Cadillac, Inc. v. Stern Haskell, Inc.*, 356 F.Supp. 1280 (S.D.N.Y.1972) (where the Court, applying New York law, held that a drawer is denied a right of action for conversion against a collecting bank).

**16.** We intimate no view with respect to any possible conversion action Birmingham may have had against the drawee bank.

**17.** These sums are the net losses after the $2,500 deductible on each property.

**18.** *See* former Bankruptcy Act § 2a(3) and (5), 11 U.S.C. § 11a(3) and (5) (repealed); Bankruptcy Rule 11 18(b), 415 U.S. 1016.

**19.** *Chase Manhattan Bank v. Banque Intra, S. A.*, 274 F.Supp. 496, 499 (S.D.N.Y.1967) *citing Miller v. Schloss*, 218 N.Y. 400, 113 N.E. 337 (1916), Restatement of Restitution § 1 (1936) and 50 N.Y.Jur. *Restitution* § 5 at 155 (1966). *See also S.S. Silberblatt Inc. v. East Harlem Pilot Block*, 608 F.2d 28, 37 (2d Cir. 1979).

**20.** *Marcraft Recreation Corp. v. Frances Devlin Co.*, *supra* at 197, *citing Bradkin v. Leverton*, 26 N.Y.2d 192, 195, 309 N.Y.S.2d 192, 257 N.E.2d 643 (1970).

**21.** In any event Birmingham, one year and one half *after* the issuance of its check to the receiver settled its action with Jabco and payed out, in accordance with that settlement, $56,180 for the damage to the Georgia warehouse. That payment by Birmingham, over and above the check to the receiver arguably was a voluntary one by Birmingham, not made under protest or duress. *Paramount Film Distributing Corp. v. State of New York*, 30 N.Y.2d 415, 334 N.Y.S.2d 388, 285 N.E.2d 695 (1972). The February 23, 1976 order of the United States District Court for the Northern District of Georgia

## B

### Midwest's Claims Against The Receiver

■ Midwest, a named payee on the check issued by Birmingham, and endorsed solely by the receiver, alleges that its rightful portion of that $25,698.19 check, $5,147, was improperly converted by the receiver.

The stipulation of facts before this Court indicates that on May 6, 1976, after due demand, Midwest instituted an action against the receiver in the Civil Court of the City of New York, New York County, for $5,147 in connection with work performed by it in repairing the windstorm damage to the Ohio warehouse. Although, as just noted, Midwest is a named payee on Birmingham's check,[22] it is concededly not an additional named insured under the policy issued by Birmingham to Overmyer.

### (a)

### Under The Uniform Commercial Code

Midwest relies upon section 3–116 of the Uniform Commercial Code which provides that:

"An instrument made payable to the order of two or more persons . . .

"(b) if not in the alternative is payable to all of them and may be negotiated, discharged or enforced by all of them."

Midwest argues that because it was named payee on Birmingham's check it is entitled, without any further showing, to its *pro rata* share of the check.

It is true that cases under the Uniform Commercial Code indicate that since a joint payee is granted the status of owner[23] or possessor[24] of the check, a *drawee bank* may not defend against an action for conversion by arguing that the non-endorsing payee gave no consideration for issuance of the check.[25] The bank's liability to the non-endorsing payee for accepting and paying a check without such payee's endorsement, even where the drawer's payment to him is gratuitous, is founded upon "[t]he general theory of the Uniform Commercial Code [which] is to place the loss occasioned by a forged endorsement[26] on the party who first dealt with the forger absent negligence on the part of the drawer or payee."[27]

---

provided that "the plaintiff [Birmingham] and Jabco-Anrem Associates Ltd. have settled this matter between themselves. . . ." *See* order annexed as an exhibit to the stipulation of facts governing this proceeding. Of course, *assuming arguendo* that the facts here demonstrated unjust enrichment, which they clearly do not, restitution could be denied because any alleged benefit to the receiver was officiously conferred upon him by Birmingham when it settled with Jabco. *See e.g.* 50 N.Y.Juris. *Restitution and Implied Contracts* § 34 at 223–225 (1966); 43 N.Y.Juris. *Payment* § 79 at 562 (1965) *cited in Evans v. City of Johnstown*, 96 Misc.2d 755, 764, 410 N.Y.S.2d 199 [Sup.Ct. Fulton Co. 1978] ); Restatement of Restitution §§ 2 and 12 (1936). *Compare* 22A Appleman, Insurance Law and Practice § 14555 at 451 (1979). Finally, even if Birmingham were to maintain that it was not a "volunteer" when it settled with Jabco, because Birmingham had an interest to protect when it settled, such settlement could not bind the consolidated debtors because they were not made parties to Birmingham's action against Jabco. *See* Palmer, Law of Restitution § 10.6 at 402 (1978).

**22.** Although the stipulation of facts fails to reveal why Midwest was named a joint payee on Birmingham's check, Midwest's amended answer and claim in Interpleader alleges that after Midwest completed repairs upon the Ohio warehouse, it filed a proof of loss with Birmingham. We surmise that Birmingham included Midwest, *inter alia*, as a co-payee, to accommodate Midwest in the collection of its claim. Note, *Discharge of Joint-Payee Instruments, supra* at 738.

**23.** *Smith v. Louisiana Bank & Trust Co.*, 255 So.2d 816, 820–1 (La.App.1977), *rev'd on other grounds*, 272 So.2d 678 (La.1973).

**24.** *Trust Co. of Columbus v. Refrigeration Supplies Inc.*, 241 Ga. 406, 246 S.E.2d 282, 284 (1978).

**25.** *Id.*

**26.** *Federal Deposit Ins. Corp. v. Marine Nat'l Bank of Jacksonville*, 431 F.2d 341, 344 (5th Cir. 1970) (where the court held that paying on an instrument with a missing endorsement is "analogous to payment on a forged endorsement".) See also 2 Anderson Uniform Commercial Code § 3-419; 4 at 1034–5 (1971). *But see Berkheimer's, Inc. v. Citizens Valley Bank*, 270 Or. 807, 529 P.2d 903, 904 (1974).

**27.** *Thornton & Co. v. Gwinnett Bank & Trust Co.*, 151 Ga.App. 641, 260 S.E.2d 765, 768 (1979).

It is no coincidence that reported cases dealing with actions, under the Uniform Commercial Code, by a joint payee for conversion of a check, without his endorsement, have been actions brought against a bank,[28] not against the "forging" copayee. To be sure, Uniform Commercial Code § 3–419, which specifically designates certain acts as constituting a conversion, provides as follows:

"(1) An instrument is converted when

"(a) a drawee to whom it is delivered for acceptance refuses to return it on demand; or

"(b) any person to whom it is delivered for payment refuses on demand either to pay or to return it; or

"(c) it is paid on a forged instrument."

Clearly, such provisions are not directed against the "miscreant" payee but rather against the culpable party who has dealt with the former.[28a] Having said this, we do not grant immunity to the receiver, but rather analyze the conversion, alleged here, under principles of common law, without reference to the Uniform Commercial Code.[29]

(b)

*Under Common Law Principles
Of Conversion*

As we noted earlier, in connection with Birmingham's conversion claim against the receiver, for a party here to prevail on its claim of conversion, under principles of common law, one must demonstrate that as against the receiver, such party has a superior right to possess the proceeds of the check.

The receiver, as well as the consolidated debtors, maintain that Midwest has no rights to the proceeds of Birmingham's check since Midwest was gratuitously named as payee by the drawer, Birmingham. They argue that there was no consideration to Birmingham for designating Midwest a copayee. Rather it was, they would doubtless argue, merely an accommodation by the insurer "to assist lienholders in the collection of their claims against the proceeds."[30]

The burden to demonstrate the fact that despite a facial conversion,[31] Midwest sustained no damage is, of course, upon the receiver.[32] The stipulation of facts entered into between and among the parties critically reveals that Midwest is not an additional named insured under the policy of insurance upon which the check was grounded. To be sure, as stated earlier, Midwest bases its claim to certain proceeds of the check *solely* on the ground that the receiver cashed the check without Midwest's endorsement. But since Midwest was not a named insured under the policy it was not entitled to share in the proceeds of a check made payable for damage sustained

---

**28.** It has been observed that this pattern emerges and is "encouraged by the law ... [since it is] the practical fact that these defendants are normally solvent." Murray, *Joint Payee Checks—Forged and Missing Endorsements*, 78 Com.L.J. 393, 404 (1973).

It should be noted, in this connection, that the Court, in *Marlboro Supply, Inc. v. Webb Supply Co.*, 350 Mass. 43, 213 N.E.2d 248, 250 (1965), held that it would be proper to order a "guilty" copayee to join with the complaining copayee, as a party plaintiff, in enforcing the latter's rights under the instrument.

*But see Litchfield v. Pfeffer*, 116 N.H. 485, 363 A.2d 413 (1976).

**28a.** Uniform Commercial Code § 3–419, defining "Conversion" "does not identify the proper plaintiffs nor, except by indirection, the proper defendants. It entirely omits the thief as a possible defendant and it fails to state the theory of the conversion cause of action." White and Summers, Handbook of the Law Under the

Uniform Commercial Code § 15–4 at 585 (2d ed. 1980). *See also Id.* at 586.

**29.** *See* Uniform Commercial Code § 1–103. *See e.g. Hillsley v. State Bank of Albany*, 24 A.D.2d 28, 263 N.Y.S.2d 578 (1st Dept. 1965) (non Code case).

**30.** Note, *Discharge of Joint—Payee Instruments*, 1 Stan.L.Rev. 730, 738 (1949).

**31.** The "cashing of a check upon which the payee's endorsement was forged or unauthorized" is a conversion. 10 N.Y.Juris. *Conversion* § 25 at 520 (1960).

**32.** *Hillsley v. State Bank of Albany, supra* at 31, 263 N.Y.S.2d 578; *Tonelli v. Chase Manhattan Bank, N. A.*, 53 A.D.2d 183, 184–5, 386 N.Y.S.2d 424 (1st Dept. 1976), *aff'd* 41 N.Y.2d 667, 394 N.Y.S.2d 858, 363 N.E.2d 564 (1977).

by the insureds under the policy. Accordingly, Midwest has not been damaged by the receiver's actions and is not entitled to a portion of the check's proceeds.

### C

### Earl E. Bright's Claim Of An Equitable Lien

Subsequent to the windstorm damage to the Overmyer warehouse, Earl E. Bright Inc. furnished certain labor, materials and equipment to repair the roofing, insulation, steel deck and gutter at an alleged value of $21,800. To date that amount has not been paid.

On October 5, 1973 Bright filed affidavits for several mechanic's liens against the Ohio warehouse. On November 1, 1974 the warehouse was sold at a foreclosure sale for an amount insufficient to satisfy the debt allegedly due Bright.

As stated earlier, Birmingham delivered a check to the receiver, on or about August 26, 1974 in the sum of $25,698.19 as payment, *inter alia*, of the insurance proceeds due the consolidated debtors for the losses sustained at the Ohio warehouse. Bright maintains, as a copayee of that check, that it is entitled to an equitable lien on the proceeds of the check in the amount of $21,800.

It has been authoritatively stated, albeit inelegantly, that

> "[a]n equitable lien is not an estate or property in the thing itself nor a right to recover the thing .... It is simply a right of a special nature *over* the thing which constitutes a charge or encumbrance upon the thing." [33]

Presumably the "thing" here is the Ohio warehouse. Upon its damage by the windstorm, Bright claims, by some right, a charge upon the proceeds of the insurance check which represent the loss to the warehouse. Bright, however, appears to misapprehend the essentials of an equitable lien.

> " 'An equitable lien arises either from a written contract which shows an intention to charge some particular property with a debt or obligation, or is implied and declared by a court of equity out of general considerations of right and justice as applied to the relations of the parties and the circumstances of their dealings....' " [34]

■ Thus, in order to charge an equitable lien on property, we are counseled, "there must be an obligation owing by one person to another, a *res* to which the obligation attaches, and an intent by all parties that the property serve as security for the payment of the obligation...." [35]

■ Here, however, Bright neither alleges, nor attempts to demonstrate, that it and Overmyer, by contract, intended, to create a specific charge [36] upon the pre-damaged warehouse and thus upon the insurance proceeds, which represented damage to the Ohio warehouse, long antedating Bright's labors and its subsequent mechanics lien. [37]

Neither is there any justification advanced by Bright that would move us, "out of general considerations" [38] of equity, to apply an equitable lien under the circum-

---

**33.** 4 Pomeroy's Equity Jurisprudence § 1233 at 692 (5th ed. 1941) (emphasis in text).

**34.** *Syring v. Sartorious*, 28 Ohio App.2d 308, 277 N.E.2d 457, 459 (1971) (cases omitted). *See also Klaustermeyer v. Cleveland Trust Co.*, 89 Ohio Ct. 142, 105 N.E. 278, 280 (1913). The parties do not dispute that Ohio law governs Bright's claim of an equitable lien. It is clear that state law controls questions of equitable liens. *General Motors Acceptance Corp. v. Jones (In re Czebotar)*, 5 B.R. 379, 381 (Bkrtcy. E.D.Wash.1980) (cases cited).

**35.** *R. M. Shoemaker Co. v. Southeastern Pennsylvania Economic Development Corp.*, 275 Pa.

Super. 594, 419 A.2d 60, 63 (1980) (cases omitted) (emphasis in text). *Accord General Insurance Co. of America v. Lowry*, 412 F.Supp. 12 (S.D.Ohio 1976) (applying Ohio law), *aff'd* 570 F.2d 120 (6th Cir. 1978).

**36.** See 34 Ohio Jur.2d *Liens* § 18 at 428 *quoted* in *Beverly v. Adrian Construction Co.*, 9 Ohio Misc. 176, 222 N.E.2d 460, 462 (1966).

**37.** On the sparse presentation here, we are in no position to affirm or deny the validity of Bright's mechanics lien.

**38.** *Syring v. Sartorious, supra* note 35.

stances present here. We find no basis, on this record, therefore, to disturb a dominant theme pervading bankruptcy cases, that creditors be treated equally.[39] Accordingly, Bright's claim for an equitable lien is denied.

## IV

### *Conclusion*

For the reasons set forth above, Robert H. Herzog, as Receiver of D. H. Overmyer Co., Inc. (Ohio) et al., on behalf of the consolidated debtors, is entitled to the proceeds of the Birmingham check made out to him and others in the sum of $25,698.19.[40]

Mr. Herzog is directed to turn over that sum, plus interest accrued thereon, to the custodial receiver's account maintained by Hon. Harold R. Tyler Jr., Custodial Receiver for the consolidated debtors.

Settle an order on three (3) days notice in conformity with this decision.

---

**39.** *Israel-British Bank (London) Ltd. v. Federal Deposit Insurance Corp.*, 536 F.2d 509, 513 (2d Cir.), *cert. denied, sub nom. Bank of Commonwealth v. Israel-British Bank (London), Ltd.*, 429 U.S. 978, 97 S.Ct. 487, 50 L.Ed.2d 585 (1976). *Cf.* Palmer, Law of Restitution § 4.10 at 453 (1978) (dealing with constructive trusts and other equitable remedies).

**40.** We do not reach, within the confines of this adversary proceeding, Birmingham's proof of claim filed for unpaid premiums.