**In re CALUMET FARM, INC., Debtor.**

**CALUMET FARM, INC., Plaintiff,**

**v.**

**NORTHERN EQUINE THOROUGHBRED PRODUCTIONS, LTD.; Hill N' Dale Farm of Gormley, Ontario, Canada; 724334 Ontario, Ltd., Defendants.**

**Bankruptcy No. 91–1414.**
**Adv. No. 91–5224.**

United States Bankruptcy Court,
E.D. Kentucky,
Lexington Division.

Oct. 20, 1992.

Philip L. Hanrahan, Stites & Harbison, Lexington, KY, for plaintiff.

Stephen M. O'Brien, Landrum & Shouse, Lexington, KY, for Northern Equine Thoroughbred & 724334 Ontario, Ltd.

J. Montjoy Trimble, Lexington, KY, for Hill N' Dale Farm.

## MEMORANDUM OPINION

JOE LEE, Chief Judge.

This matter is before the court on the motion of plaintiff, debtor-in-possession Calumet Farm, Inc., for summary judgment avoiding the consensual lien of the defendant, Northern Equine Thoroughbred Productions, Ltd., in the stallion TALINUM as a preferential transfer of property of the estate and preserving the lien for the benefit of the estate. 11 U.S.C. § 547(b); 11 U.S.C. § 551. The plaintiff Calumet[1] seeks a further determination by summary judgment that three breeding seasons to the stallion TALINUM exercised by the defendant Hill N' Dale Farm of Gormley, Ontario, Canada or its assignee resulted in preferential transfers in the form of credits on the indebtedness of Calumet to Northern Equine. Calumet seeks to avoid these transactions and to recover the value of the seasons from Northern Equine. 11 U.S.C. § 547(b); 11 U.S.C. § 550(a).

This matter is also before the court on the motion of the plaintiff debtor-in-possession for summary judgment approving its rejection of a Limited Price Call Option Agreement between Calumet and the defendant 724334 Ontario, Ltd., and on the joint counter-motion of the defendants Northern Equine and 724334 Ontario, Ltd. for partial summary judgment determining that the option agreement is not an executory contract and therefore is not subject to rejection by the debtor-in-possession.

FINDINGS OF FACT:

Northern Equine Thoroughbred Productions, Ltd., a Canadian corporation, is engaged in the business of breeding and racing thoroughbred horses and in buying and selling such horses and shares and breeding rights therein. The stock of Northern Equine is owned by John Sikura and his three children. Sikura is and at all relevant times was president of Northern Equine. In 1988 Northern Equine owned the thoroughbred horse TALINUM, a 1984 chestnut colt by ALYDAR out of WATER LILY. According to the uncontradicted testimony of John Sikura, in late 1988 Calumet Farm, Inc., of Lexington, Fayette County, Kentucky, acting through its then president, J.T. Lundy, offered to purchase a one-half interest in TALINUM upon the colt's retirement from racing. Calumet offered approximately $1.4 million payable in cash and breeding seasons. Sikura had entertained other offers to purchase TALINUM, including another offer in 1988 to purchase the horse for $2.85 million, but refused the offers because of undesirable tax consequences under Canadian law associated with a cash sale, and because Sikura wanted to retain an interest in the horse when it was retired to stud.

Sikura, acting on behalf of Northern Equine, offered to sell a one-half interest in TALINUM to Calumet with the consideration to be paid on a deferred basis over an approximately six-year period. Sikura's accountants computed the total purchase price as $3.6 million, inclusive of simple interest at the rate of 11% per annum,[2]

---

1. Phoenix Corp. is the successor in interest to Calumet Farm, Inc., the name "Calumet Farm" having been sold at auction in April, 1992. This matter was heard and taken under advisement on April 1, 1992, prior to the date on which the name Calumet Farm was sold and the date on which the debtor-in-possession was first identified as Phoenix Corp. in pleadings filed in this case. For sake of clarity the plaintiff/debtor-in-possession will be referred to in this adversary proceeding as Calumet.

2. See exhibit "C" to the deposition of John Sikura, January 14, 1992, in which Sikura set forth the calculations used in reaching the $3.6 mil-

payable over a five and one-half year period.

On December 15, 1988, Calumet and Northern Equine executed an agreement denominated "Talinum Agreement of Purchase and Sale" (hereinafter "purchase agreement" or "purchase and sale agreement") whereby Northern Equine agreed to sell and Calumet agreed to buy the thoroughbred horse TALINUM in accordance with the terms and conditions set forth therein.[3]

The purchase agreement provides in pertinent part:

THAT, WHEREAS, the Seller is the present owner of the entire interest in and to the thoroughbred colt TALINUM (ch. 1984), by ALYDAR out of WATER LILY Fr. (hereinafter the "Thoroughbred") ...,

WHEREAS Seller has agreed to sell to Buyer, and Buyer has agreed to purchase from Seller, for the price and upon the terms and conditions hereinafter set forth, the Thoroughbred.

NOW THEREFORE, in consideration of the mutual covenants and agreements of the parties as hereinafter set forth, it is hereby agreed by and among the Seller, and the Buyer and the Thoroughbred Manager as follows, to-wit:

### PART I—PURCHASE AND SALE

*1. Purchase Price and Payment.* Seller hereby sells to Buyer, and Buyer hereby purchases from Seller, the Thoroughbred for total consideration ... as follows....

Talinum Agreement of Purchase and Sale, at 1–2.

The purchase agreement reflects a purchase price of $3.6 million "inclusive of interest" which "shall be paid in full on or before July 31 of the sixth (6th) year the Thoroughbred stands at stud...." The agreement required Northern Equine to retire TALINUM from racing and deliver the

horse to Calumet on or before December 24, 1988, to stand at stud.

According to Sikura, Calumet was concerned that the interest rate of 11% was too high for a 5½ year period. To allay Calumet's concerns Sikura agreed that another of his corporations would subscribe to 30 seasons to TALINUM (six seasons per year for five years) at a fixed price of $15,000 per season and to credit the value of the seasons against the purchase price, which in effect resulted in a reduction of $450,000 in the purchase price of the colt.

The purchase agreement provides:

Until the Purchase Price has been paid in full, Hill N' Dale Farm of Gormley, Ontario, Canada shall receive, six (6) Fifteen Thousand Dollar ($15,000.00) live foal guaranteed seasons a year to the Thoroughbred, which shall be applied as a credit in favor of Buyer towards the Purchase Price, and Buyer shall receive, at no additional cost, six (6) seasons a year to the Thoroughbred, which nominations shall be non-cumulative from one breeding season to another. In the event less than twelve (12) seasons to the Thoroughbred shall be available in a year, Buyer shall receive six (6) seasons to the Thoroughbred prior to Hill N' Dale Farm receiving its six (6) seasons to the Thoroughbred, provided however, the seasons available to Buyer and Seller hereunder shall be available on a "first come—first serve" basis.

TALINUM Agreement of Purchase and Sale, Part I, ¶ 1.D., at 3.

Hill N' Dale Farm of Gormley, Ontario, Canada is owned by Hill N' Dale Farms, Ltd., an Ontario corporation whose stock is owned by John Sikura and two of his children. Northern Equine, which does not own any real estate, boards its horses at Hill N' Dale Farm. Sikura is also president of Hill N' Dale Farms, Ltd.

The purchase agreement provides the purchase price is payable from sales by

lion price. The value of a one-half interest in the horse was represented to be $1,412,000; the amount of interest was represented to be $2,188,000.

**3.** Sikura authorized his son who resides in Lexington, Kentucky, to sign the agreement on behalf of Northern Equine.

Calumet of live foal seasons, single seasons, foal-sharing agreements, mare-sharing agreements, or other such arrangements through July 31 of the sixth year TALINUM stands at stud, at which time Calumet agreed to pay in full any balance owing on the purchase price. Northern Equine has not received any payment from Calumet for the purchase of TALINUM.

The Talinum Agreement of Purchase and Sale requires Calumet to obtain and maintain mortality insurance on TALINUM with both Calumet and Northern Equine named as loss payees in the amount of the outstanding balance owed to Northern Equine until Calumet's obligations to Northern Equine have been satisfied in full. The agreement further provides:

> In the event of payment of the proceeds of said insurance, any proceeds of insurance not required to satisfy Buyer's remaining obligations to Seller, shall belong solely to the Buyer and if the proceeds of insurance are insufficient to satisfy Buyer's remaining obligation to Seller, Buyer shall pay the Seller by certified check the uninsured balance and neither party shall have any further obligations under this Agreement.

Talinum Agreement of Purchase and Sale, Part I, ¶ 2.E., at 8–9.

The December 15, 1988 purchase agreement authorized Northern Equine to retain a security interest in TALINUM to secure payment of the purchase price by Calumet. A financing statement giving notice of such security interest was filed in the office of the Fayette County Clerk at Lexington, Kentucky, on May 10, 1991. Calumet filed its petition for relief under chapter 11, title 11 United States Code on July 11, 1991. Calumet contends the perfection of the security interest within 90 days preceding bankruptcy constitutes a preference which may be avoided pursuant to 11 U.S.C. § 547(b).

Hill N' Dale and/or Northern Equine received six live foal guaranteed seasons for each of the 1989 and 1990 breeding seasons, for which Northern Equine appears to have credited the amount of $180,000 against the purchase price of TALINUM.[4]

In 1991 Northern Equine exercised two seasons it acquired pursuant to the TALINUM Agreement of Purchase and Sale and transferred a third season which was exercised by the transferee of the season. On April 16, 1991, the mare ASTAIRE STEP, owned by Northern Equine, was bred to TALINUM. On May 1, 1991, the mare CELIA DEAREST was bred to TALINUM. CELIA DEAREST was owned by Foxfield Thoroughbreds, Inc., which acquired a season to TALINUM from Northern Equine in a trade of seasons. On June 12, 1991, the mare ELECTIVE, owned by Northern Equine, was bred to TALINUM. Calumet seeks to avoid the transfers of these three seasons from Calumet to Northern Equine and to recover the value of these three seasons from Northern Equine under the theory that transfers of these breeding rights to Northern Equine occurred within 90 days preceding bankruptcy and are avoidable and recoverable as preferences pursuant to 11 U.S.C. §§ 547(b) and 550(a).

Simultaneously with the execution of the Talinum Agreement of Purchase and Sale between Calumet and Northern Equine, Calumet and 724334 Ontario, Ltd., an affiliate of Northern Equine, executed a Limited Price Call Option Agreement whereby the purchase of TALINUM by Calumet was acknowledged and the affiliate corporation 724334 was granted an option to purchase from Calumet a one-half interest in TALINUM for the sum of $1.00, which option is exercisable only subsequent to July 31, 1995. The option agreement provides:

> WHEREAS, Calumet has purchased the Thoroughbred colt TALINUM ...; and
>
> WHEREAS, 724334 was indispensable in assisting Calumet in securing the terms and conditions acceptable to it for the acquisition of TALINUM; and
>
> WHEREAS, as consideration for 724334's assistance, Calumet has agreed to give 724334 a Limited Price Call Option to purchase a one-half interest in

---

4. For purposes of this motion for summary judgment the court has taken judicial notice of the proof of claim filed by Northern Equine, which states the balance owing is $3,420,000.

and to TALINUM under the following terms and conditions.

NOW, THEREFORE, ... the parties hereby covenant and agree, intending to be legally bound as follows:

1. *Contract Price.* 724334 may deliver to Calumet a check in the amount of One ($1.00) Dollar and upon delivery and in exchange for said check Calumet shall deliver to 724334 a Bill of Sale representing the transfer by Calumet to 724334 a one half (½) interest in and to the thoroughbred TALINUM.

2. *Exercise Date.* This Option can be exercised only subsequent to midnight of July 31, 1995.

Limited Price Call Option ¶¶ 1–2.

724334 Ontario, Ltd. is an Ontario, Canada corporation the majority of whose stock is owned by Northern Equine. Sikura and his three children, the sole shareholders of Northern Equine, each own one share of stock in 724334. 724334 owns a farm in Ontario and some horses maintained at the farm.

Northern Equine asserts that the purchase agreement and the option agreement constitute one contract whereby Northern Equine sold only a one-half interest in TALINUM. Sikura explained that had Northern Equine sold TALINUM for cash Northern Equine would have incurred under Canadian law a liability for taxes in an amount equal to 65–70% of the income derived from the sale. Sikura stated that the transaction was structured to reduce the Canadian tax obligations of Northern Equine.

> Northern Equine's tax liability was deferred by virtue of the fact that it was done on a six-year basis as opposed to a cash deal; right? And the call option which is part of that agreement deferred taxes because 724334 had carry forward and was looking at substantial capital losses in horse-related investments, so that whatever came in would have offset the capital loss.

Deposition of John Sikura, January 14, 1992, at 36 (hereinafter "Sikura deposition").

> Sikura also testified as follows:

> See, Northern Equine at no time sold any more than half the horse, for which they would have gotten paid in 1994, and 724334 would have exercised their option to buy half the horse back.

Sikura deposition at 37.

> [In identifying defendant's exhibit B, the Limited Price Call Option]: Yes, this is part of the first agreement whereby the other half of the horse came back to us after the six years for a dollar.

Sikura deposition at 12.

> [The two documents] were drawn primarily for the reason that we were able to shelter the other half of the stallion, the call action [sic] for a dollar into 724334, which is a wholly-owned subsidiary which had some losses and would not be liable for taxes if and when they exercised the option.

Sikura deposition at 13.

> Q. Now why, again was the deal structured to sell the whole horse when you intended to sell one-half the horse?

> A. Well, it was simple, because when we spoke to the auditors to defer the tax problems and what not, they wanted the whole horse off of Northern Equine's books and then get back in with the call option.

Sikura deposition at 61.

On November 5, 1991, Calumet filed a motion requesting, among other things, the entry of an order approving its rejection of the Limited Price Call Option agreement with the defendant 724334 Ontario, Ltd. as an executory contract.

On November 5, 1991, 724334 notified Calumet by letter of its intent to thereby exercise its option to purchase a one-half interest in and to TALINUM and tendered a check in the amount of $1.00. Calumet refused to recognize 724334's attempted exercise of the option on the grounds that the option cannot be exercised until August 1, 1995 at the earliest and on the grounds that Calumet had earlier on the day of November 5, 1991 filed a motion for an order approving rejection of the option contract as an executory contract. Calumet

returned the $1.00 check to counsel for 724334.

On November 6, 1991, Northern Equine filed a motion styled "Motion of Northern Equine Thoroughbred Productions, Ltd. and 724334 Ontario, Ltd. to Require Debtor Calumet Farm, Inc. Pursuant to 11 U.S.C. § 365 to Assume or Reject Certain Executory Contracts and to Provide Adequate Assurance if Such Contracts are Assumed and Fix a Time for Assumption or Rejection."

On November 14, 1991, the court conducted a hearing on Calumet's motion of November 5, 1991, and Northern Equine's motion of November 6, 1991, and reserved ruling on the motions pending a determination of issues relating to the option contract in this adversary proceeding.[5]

Pending before the court are the following motions:

1. Calumet's motion for summary judgment: (a) avoiding the security interest of the defendant Northern Equine in TALINUM; and (b) permitting recovery of the value of three breeding seasons utilized by the defendants Northern Equine and Hill N' Dale in 1991;

2. Calumet's motion for summary judgment on all issues relating to its rejection pursuant to section 365 of the Bankruptcy Code of the option contract with 724334 Ontario, Ltd.;

3. Northern Equine's motion for partial summary judgment determining that Northern Equine and 724334 hold a one-half interest in and to the stallion TALINUM.

CONCLUSIONS OF LAW:

1. *The security interest of Northern Equine in TALINUM.*

■ Calumet seeks to avoid the security interest of Northern Equine, which was perfected on May 10, 1991, as a preferential transfer. 11 U.S.C. § 547(b).

In its written response to Calumet's motion for summary judgment Northern Equine admitted that a financing statement was filed on May 10, 1991 and that no financing statement had been filed to perfect Northern Equine's security interest prior thereto.

At the hearing on this matter counsel for Northern Equine argued that because there is no competing security interest in TALINUM, the security interest of Northern Equine is valid as between Calumet and Northern Equine, despite the failure of Northern Equine to perfect the security interest until approximately 60 days prior to the date on which Calumet filed its chapter 11 petition.[6]

The argument of Northern Equine overlooks the fact that 11 U.S.C. § 551 grants to the trustee (and the debtor-in-possession by application of 11 U.S.C. § 1107) the power to preserve an avoided transfer of property of the debtor for the benefit of the estate and creditors generally.

Section 547(e) provides in pertinent part:

(e)(1) For purposes of this section—

. . . .

(B) a transfer of a fixture or property other than real property is perfected when a creditor on a simple contract cannot acquire a judicial lien that is superior to the interest of the transferee.

(2) For the purposes of this section . . . , a transfer is made—

(A) at the time such transfer takes effect between the transferor and the transferee, if such transfer is perfected at, or within 10 days after, such time;

---

**5.** This adversary proceeding was commenced on November 12, 1991. On November 13, 1991, Northern Equine filed a complaint, adversary proceeding number 91–5225, seeking a declaration that 724334 is the owner of a one-half interest in TALINUM. Because the issue raised therein is identical to the issues raised by Calumet in this adversary proceeding the court ordered adversary proceeding number 91–5225 be consolidated with number 91–5224.

**6.** First City, Texas–Houston, N.A. may claim a security interest in and to TALINUM. The extent of any interest asserted by First City or other claimants, as well as issues concerning the priority of those parties claiming an interest in TALINUM, are not before the court in this adversary proceeding. See *Phoenix Corp. v. Hill N' Dale Farm of Gormley, Ontario, Canada, et al.,* Adv. No. 92–5048 (Bankr.E.D.Ky.).

(B) at the time such transfer is perfected, if such transfer is perfected after such 10 days; ....

11 U.S.C. § 547(e).

Assuming Northern Equine retained a security interest in the Talinum Agreement of Purchase and Sale which was executed on December 15, 1988, the security interest was not perfected until May 10, 1991, the date on which Northern Equine filed a financing statement. For purposes of section 547 the transfer took place on May 10, 1991, which is within the 90–day reachback period of section 547(b).

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, admissions, and supporting affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Bankr.P. 7056(c). There are no issues of fact with respect to the remaining elements of proof under section 547(b). Calumet's motion for summary judgment avoiding the security interest of Northern Equine in TALINUM shall be sustained.

### 2. The 1991 breeding rights exercised by Northern Equine and Hill N' Dale.

■ In 1991, within 90 days preceding bankruptcy, Northern Equine exercised two breeding rights and transferred one breeding right which was exercised by the transferee. Calumet seeks to avoid these transfers pursuant to 11 U.S.C. § 547(b) and recover the value of the seasons from Northern Equine pursuant to 11 U.S.C. § 550(a).[7]

Northern Equine and Hill N' Dale contend that the transfers which Calumet seeks to avoid occurred when the Talinum Agreement of Purchase and Sale was executed, not when the breeding rights were exercised. Northern Equine and Hill N' Dale also argue that the ordinary course of

business exception of 11 U.S.C. § 547(c)(2) shields the transfers from avoidance.

Questions concerning application of the ordinary course of business exception to the transactions involved herein are fact-intensive and not capable of resolution by summary judgment. Without deciding the issue of when the transfer of each of these three breeding rights occurred, Calumet's motion for summary judgment on this issue shall be overruled.

### 3. The Limited Price Call Option.

The parties have filed cross-motions for summary judgment concerning the legal consequences of the Limited Price Call Option which Calumet granted to 724334. By their joint motion for summary judgment Northern Equine and 724334 argue the purchase agreement and the option when taken together evidence a sale by Northern Equine to Calumet of only a one-half interest in TALINUM. Calumet contends the parol evidence rule precludes consideration of both the testimony of John Sikura and the separate Limited Price Call Option Agreement to the extent such evidence contradicts the terms of the Talinum Agreement of Purchase and Sale.

■ The purchase agreement and the option agreement evidence transactions between Calumet on the one hand and two related corporate entities, Northern Equine and 724334, on the other. Under the parol evidence rule set forth in KRS 355.2–202, terms included in a writing intended by the parties to be a complete and exclusive statement of the terms of the contract may not be contradicted by any prior oral or written agreement or by any oral agreement entered into contemporaneously with the written agreement intended to be the final expression of those terms. But two written documents executed contemporaneously may be considered together as evidence of the parties' agreement.

---

7. Calumet is requesting an award of $45,000, representing $15,000 per season as the value agreed upon in the Talinum Agreement of Purchase and Sale. For purposes of 11 U.S.C. § 550(a), which provides that to the extent a transfer is avoided under 11 U.S.C. § 547(b) the trustee may recover the value of property transferred, it is not clear whether Calumet would be permitted to recover $45,000 or an actual market value of three 1991 seasons to TALINUM. Presently the stud fee for breeding mares to TALINUM is apparently only $5,000.

The written agreements indicate that Northern Equine sold its entire interest in the thoroughbred TALINUM to Calumet on December 15, 1988, and that subsequent to midnight of July 31, 1995, 724334 may purchase a one-half interest in TALINUM by tendering $1.00 to Calumet.

The purchase agreement requires Calumet to carry mortality insurance on TALINUM, with loss payees to be Calumet and Northern Equine, until Calumet pays Northern Equine in full, after which any insurance proceeds would be payable solely to Calumet. Northern Equine and 724334 did not maintain a mortality insurance policy on TALINUM until 724334 attempted to exercise the option in November 1991. The agreement further provides that if proceeds of the mortality insurance must be paid, any proceeds not required to satisfy Calumet's remaining obligations to Northern Equine would belong to Calumet.

Pursuant to the terms of the purchase agreement, the purchase price was to be paid by Calumet from proceeds from Calumet's sale of seasons, foal-shares, and other such arrangements. After payment to Northern Equine of the full purchase price for TALINUM all proceeds from the sale of seasons and the like would belong to Calumet.

Hill N' Dale was to receive six seasons per year, for which Northern Equine would credit $15,000 per season against the purchase price.[8]

The option agreement does not provide for an acceleration of the date on which 724334 may exercise the limited price call option in the event of Calumet's default on the purchase agreement. The purchase agreement provides that Northern Equine may avail itself of any rights and remedies given to a secured party under the Uniform Commercial Code as enacted in the Commonwealth of Kentucky.

The Limited Price Call Option grants to 724334 a right of first refusal to purchase Calumet's interest in TALINUM but only in the event 724334 exercises the option, an event that cannot occur prior to midnight of July 31, 1995.

Neither Northern Equine nor 724334 has enjoyed any of the benefits of ownership in TALINUM since December 15, 1988, nor is there evidence that either entity has suffered the consequences of ownership since that date. By Sikura's own admission the transaction was structured to ameliorate the tax consequences of the sale for Northern Equine and to utilize tax attributes of 724334; it does not appear that for tax purposes 724334 treated the transaction as one in which it acquired or retained a one-half interest in TALINUM as of December 15, 1988.

Sikura testified the parties anticipated Calumet would complete payments to Northern Equine by July 31, 1995, whereupon 724334 would exercise the option. In fact the purchase agreement required Calumet to pay the purchase price "on or before July 31 of the sixth (6th) year the Thoroughbred stands at stud." Assuming TALINUM first stood at stud in 1989, the purchase price was payable in full on or before July 31, 1994, yet the option is not exercisable until July 31, 1995, a year after the indebtedness to Northern Equine was to have been satisfied.

In addition, the purchase agreement did not preclude early payment of the purchase price. Presumably Calumet could have paid the purchase price in full over the objections of Sikura that to do so would result in a sizeable tax liability for him. For example, it is conceivable that after three years as a result of the performance

---

**8.** Calumet was to receive six seasons per year, but if fewer than twelve seasons were available in a year Calumet would receive its six seasons prior to Hill N' Dale receiving any seasons. The agreement states that in the event fewer than twelve seasons are available Calumet will receive its six seasons before Hill N' Dale receives its six seasons, "provided, however, the seasons available to Buyer and Seller hereunder shall be available on a 'first come—first serve' basis." The meaning or purpose of the latter proviso is unclear to the court. It appears to nullify the very sentence it purports to modify. One plausible interpretation would be that the proviso is intended to apply only if there are twelve or more seasons available, in which case Calumet and Hill N' Dale would receive seasons on a "first come—first serve" basis.

of progeny of TALINUM, the price of a TALINUM season could have escalated, thereby enabling Calumet to complete payment to Northern Equine prior to the maturity date of the purchase agreement. Under the terms of the purchase and sale agreement proceeds from the sale of seasons, foal-shares, and other arrangements "belong to Seller" and "shall be applied as a credit in favor of Buyer towards the Purchase Price."

Upon payment of the purchase price in full when due on July 31, 1994, or at any time prior to July 31, 1995, pursuant to the terms of the purchase and sale agreement, Calumet could retain all proceeds from the sale of seasons, foal-shares, and the like until July 31, 1995; any insurance proceeds payable on account of the death of TALINUM would be payable solely to Calumet until July 31, 1995; Calumet might sell the horse before July 31, 1995 without affording 724334 the right of first refusal, said right accruing to 724334 only after such time as 724334 exercises the option to purchase a one-half interest in TALINUM for $1.00. Nothing in either of the agreements suggests 724334 was to be considered as an owner of a one-half interest in TALINUM between December 15, 1988, and July 31, 1995, nor is there any indication 724334 would own or be permitted to exercise its option to own a one-half interest upon default of Calumet prior to July 31, 1995.

The argument that Northern Equine sold to Calumet only a one-half interest in TALINUM is refuted by the fact that under the option agreement Calumet could be required to transfer a one-half interest in the horse to 724334. Calumet would thereafter own no interest in the stallion and would have obligated itself to pay for acquisition of only a transitory one-half interest in the horse. Obviously under the purchase and sale agreement Northern Equine transferred its entire interest in the stallion to Calumet and Calumet was to own the entire interest in the stallion, subject to the lien of Northern Equine, until such time as 724334 should exercise the option to acquire a one-half interest in the stallion for one-dollar.

The agreements, when considered together, and when considered along with Sikura's explanation of the circumstances under which the contracts were executed, cannot be read to mean that either Northern Equine or 724334 somehow retained a one-half interest in TALINUM.

Sikura's testimony does not show that there is a genuine issue as to any material fact with respect to the legal effect of the purchase and sale agreement and the option agreement when considered together. Sikura's recitation of the results the parties intended to accomplish in the transaction is not supported by the written agreements, the conduct of the parties, or Sikura's own testimony.

■ Northern Equine and 724334 argue that the option agreement between Calumet and 724334 is not an executory contract that can be rejected by Calumet because it does not meet the Countryman test for determining whether a contract is executory. Under the Countryman test an executory contract is one under which the obligations of both the debtor and the nondebtor party to the contract are so far unperformed that failure of either to complete performance would constitute a material breach excusing performance by the other party. Countryman, *Executory Contracts in Bankruptcy: Part I*, 57 Minn. L.Rev. 439, 460 (1973). Under this analysis it is argued that the failure of 724334 to exercise the option to purchase a one-half interest in the stallion and to pay Calumet one dollar for a one-half interest in the stallion would not be a material breach because Calumet would then simply retain full ownership of the stallion.

It seems obvious, however, that the conclusion that the option agreement is or is not an executory contract in this instance produces the same result for 724334. If it is an executory contract which Calumet is permitted to reject 724334 has an unsecured claim for damages resulting from the rejection. 11 U.S.C. § 502(g). If it is not an executory contract, the agreement confers on 724334 the equitable remedy of specific performance when the time for exercise of the option arrives. This claim for

specific performance likewise is provable as an unsecured claim for damages. 11 U.S.C. § 101(5)(B).

A recent report of a study or working group of the National Bankruptcy Conference which focuses primarily on section 365 of the Bankruptcy Code, 11 U.S.C. § 365, is especially pertinent to the facts of this case.

For most contracts, the consequences of breach under nonbankruptcy law is a damages claim. Thus, when a contract is rejected in bankruptcy, the nondebtor party to the contract will have a general claim for damages which should be determined in the same manner as under non-bankruptcy law (subject to any generally-applicable bankruptcy law limitations, such as those set out in § 502(b) [11 U.S.C. § 502(b)]).

For other contracts, however, non-bankruptcy law grants equitable remedies, including specific performance, in favor of the nondebtor party. In the absence of assumption, the estate is not bound by the debtor's contracts. For this reason equitable remedies generally are unenforceable against the estate (subject to the exceptions noted hereinafter). Moreover, equitable remedies represent full performance or payment for one creditor at the expense of other creditors in contravention of the equality principle and should be generally unenforceable for that reason alone. There are certain exceptions however. The estate takes the debtor's property subject to whatever rights exist in the nondebtor party. When equitable remedies confer on the nondebtor party a right in or to *specific property* these remedies should be enforceable against the estate because they are the functional equivalent of a valid lien or security interest in personal property or a mortgage or estate in real property, under relevant non-bankruptcy law. Of course, like a lien, security interest, mortgage or estate, these remedies should be enforceable only if they can survive bankruptcy's avoiding powers; thus, for example, they must be good as against the hypothetical parties (lien creditor or bona fide pur-

chaser as applicable) identified in § 544(a) [11 U.S.C. § 544(a)]. This report does not preclude the possibility that there may be other situations in which bankruptcy courts may find equitable remedies enforceable on a case-by-case basis.

National Bankruptcy Conference Code Review Project Working Draft at 172–73 (Sept. 1, 1992).

■ In this instance there is no filing of record to place third parties on notice that 724334 is claiming a nonpossessory lien interest in the stallion TALINUM. Thus the option agreement is subordinate to the rights of the trustee (debtor-in-possession) as a hypothetical judgment lien creditor under section 544(a) of the Bankruptcy Code, 11 U.S.C. § 544(a). The unfiled lien interest of 724334 is avoidable under 11 U.S.C. § 544(a) in the same manner as the tardily filed lien of Northern Equine is avoidable under 11 U.S.C. § 547(b), and both liens are preservable for the benefit of the estate.

## ORDER

In conformity with the Memorandum Opinion this day entered, IT IS ORDERED:

1. The motion of plaintiff, Calumet Farm, Inc., for summary judgment avoiding the consensual lien of the defendant, Northern Equine Thoroughbred Productions, Ltd., in the stallion TALINUM as a preferential transfer of property of the estate and preserving the lien for the benefit of the estate is SUSTAINED.

2. The motion of plaintiff, Calumet Farm, Inc., for summary judgment determining that three breeding seasons to the stallion TALINUM exercised by the defendant Hill N' Dale Farm of Gormley, Ontario, Canada or its assignee resulted in preferential transfers in the form of credits on the indebtedness of Calumet to Northern Equine is OVERRULED.

3. The joint motion of defendants Northern Equine Thoroughbred Productions, Ltd. and 724334 Ontario, Ltd., for partial summary judgment determining that the option agreement is not an execu-

tory contract is OVERRULED. The claims of Northern Equine Thoroughbred Productions, Ltd. and 724334 Ontario, Ltd. shall be allowed as unsecured claims against the estate of the debtor Calumet Farm, Inc.