In re Stewart Milton POWERS,
Jr., Debtor.

BRANCH BANKING AND TRUST
CO. OF VIRGINIA, INC., F/k/a
Commerce Bank, Plaintiff,

v.

Stewart Milton POWERS, Jr., Defendant.

Bankruptcy No. 97–25345.
Adversary No. 97–2213.

United States Bankruptcy Court,
E.D. Virginia,
Norfolk Division.

Oct. 1, 1998.

Lawrence H. Glanzer, Marcus, Santoro, Kozak & Melvin, P.C., Portsmouth, VA.

Melvin R. Zimm, Glasser and Glasser, P.L.C., Norfolk, VA.

## MEMORANDUM OPINION
## AND ORDER

DAVID H. ADAMS, Bankruptcy Judge.

This matter comes before the Court on the complaint of Branch Banking and Trust Co. ("BB & T") to determine the dischargeability of a debt under 11 U.S.C. § 523(a)(6) owed by Stewart Milton Powers Jr. to BB & T. The plaintiff contends that the debt is nondischargeable because the defendant debtor transferred a Municipal Bond Investment Portfolio Account ("Portfolio Account") to First Union Bank ("First Union") as security for a loan when the Portfolio Account had already been pledged to BB & T as collateral for a loan. This is a core proceeding and the Court has jurisdiction over this controversy pursuant to 28 U.S.C. § 157(b) and 28 U.S.C. § 1334.

### FINDINGS OF FACT

The debtor filed a petition for relief under Chapter 7 of the Bankruptcy Code on July 21, 1997. Powers was an investor in entities involved in the acquisition and rehabilitation of real properties at the time of his filing. In May of 1995, the debtor obtained a $300,000 loan from BB & T to inject capital into an entity known as MSRV Development. In order to obtain the BB & T loan, the debtor pledged his Portfolio Account maintained at Paine Webber as collateral. On January 16, 1996, the debtor obtained an additional loan from BB & T in the amount of $150,050.00 to acquire and rehabilitate a 16 unit apartment building in Hampton, Virginia. Powers executed a Consumer Pledge Agreement, in addition to Uniform Commercial Code Financing Statement filing documents, again pledging his Portfolio Account held by Paine Webber to BB & T. The plaintiff required cross-collateralization of the $300,000 note and the $150,050 note by the Portfolio Account.

In an effort to recoup some financial losses resulting from his investment in MSRV, Powers entered into loan negotiations with First Union for the purpose of purchasing Man–Jac Construction and Realty. First Union agreed to lend Powers $1,000,000 to finance the purchase of Man–Jac on the following conditions: (1) the $300,000.00 loan from BB & T was to be paid off from the loan proceeds: (2) Powers had to pledge his Portfolio Account at Paine Webber to First Union; and (3) Powers was to grant First Union a first lien on his residence. The debtor met all of these conditions on the funding of the First Union loan. It was the debtor's intention to make First Union's interest in the Portfolio Account senior to the interest of BB & T in the same asset. Powers paid off the $300,000 loan from BB & T with the proceeds of the First Union loan without advising BB & T of the resulting subordination of its position in the Portfolio Account to First Union. First Union was not made aware of BB & T's recorded security interest in the Portfolio Account and BB & T was not advised of the transfer of its collateral to First Union.

In October of 1996, the debtor defaulted on the First Union loan and faced foreclosure by the bank of its lien on his residence in Virginia Beach. At that time, the debtor thought only of saving his house; he testified that he did not consider that the transfer of possession of the Portfolio Account to First Union would deprive BB & T of its collateral. In order to avert the threatened foreclosure. Powers delivered his Portfolio Account to First Union. Soon thereafter, First Union liquidated his Portfolio Account to reduce his indebtedness to that bank. In November of 1996, the debtor defaulted on the $150,050 note held by BB & T; therefore, BB & T made a demand for full payment of the debt due under that note. The debtor was unable to comply with the demand; however, he paid $12,023.02 to BB & T on January 9, 1997, representing a principal curtailment of $10,000 and interest for November and December of 1996. In February 1997, Powers tendered another $10,000 principal payment to BB & T, which BB & T refused to accept due to the acceleration of the balance due under the $150,050 note. The debtor made

additional offers of principal payments to BB & T, which were likewise refused.

## CONCLUSIONS OF LAW

The plaintiff bears the burden of convincing the Court by a preponderance of the evidence that the discharge of the BB & T debt should be denied. *Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). Section 523(a)(6) of the Bankruptcy Code provides:

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

(6) for willful and malicious injury by the debtor to another entity or to the property of another entity.

The plaintiff asserts that the defendant's debt is nondischargeable under § 523(a)(6) because of the conversion of its collateral when the debtor caused his Portfolio Account to be delivered to First Union. "Willful and malicious injury includes willful and malicious conversion, which is the unauthorized exercise of ownership over goods belonging to another to the exclusion of the owner's rights." *Wolfson v. Equine Capital Corp.,* 56 F.3d 52, 54 (11th Cir.1995). To prove the defendant tortiously converted the plaintiff's security interest in his Portfolio Account, the "plaintiff must show it has an immediate and superior right to possession of the allegedly converted matter." *Richmond Metropolitan Hosp. v. Hazelwood (In re Hazlewood),* 43 B.R. 208, 213 (Bankr.E.D.Va.1984) (quoting *In the Matter of D.H. Overmyer Co., Inc.,* 19 B.R. 750, 754 (Bankr.S.D.N.Y.1982)). As stipulated by the parties, the Court finds the plaintiff did have a perfected security interest in and a right to the defendant's collateral. Therefore, this Court is left to determine whether the tortious conversion was willful and malicious.

The Court must address the issue of dischargeability under 11 U.S.C. § 523(a)(6) in accordance with the recent United States Supreme Court opinion. *Kawaauhau v. Geiger,* —— U.S. ——, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998). The *Geiger* opinion requires this Court to examine the subjective intent of the defendant debtor and determine whether he intended to cause injury to the plaintiff by subordinating its interest in his Portfolio Account.

Prior to the *Geiger* opinion, the application of 11 U.S.C. § 523(a)(6) was broad. Courts focused on both the malice prong and the willful prong of § 523(a)(6). The word "willful" was defined as "a deliberate or intentional act which necessarily leads to injury." *Consolidated Bank & Trust Company v. Kaestner (In re Kaestner)* 207 B.R. 511, 513 (Bankr.E.D.Va.1996) (citing *Rountrey v. Lee (In re Lee)* 90 B.R. 202, 207 (Bankr.E.D.Va. 1988)). In proving intent prior to *Geiger,* the creditor was only required to show the debtor's act was intentional; there was no requirement to show that the injury was intended. *Britton v. Price (In re Britton)* 950 F.2d 602, 605 (9th Cir.1991). When an act, such as conversion, was done intentionally and produced harm without just cause or excuse, it was willful and malicious for purposes of § 523(a)(6), without proof of a specific intent to injure. *Impulsora Del Territorio Sur, S.A. v. Cecchini (In re Cecchini),* 780 F.2d 1440, 1443 (9th Cir.1986). Intent to injure was established by showing that the debtor intentionally performed an act which necessarily caused injury or that was certain to case injury. *Corley v. Delaney (In re Delaney),* 97 F.3d 800, 802 (5th Cir.1996). The Supreme Court has recently overruled that precedent and confined the elements of § 523(a)(6) to a strict intentional tort standard.

In *Geiger,* the Supreme Court held that the § 523(a)(6) "willful and malicious injury" exception to discharge did not include mere negligent or reckless conduct, rather it was limited to intentional torts. *Geiger,* —— U.S. at ——, 118 S.Ct. at 977. In *Geiger,* the plaintiff sought treatment for an injured foot. The defendant, Dr. Geiger, prescribed oral penicillin instead of intravenous penicillin to minimize the cost of the patient's treatment, which resulted in an amputation of the plaintiff's foot. The plaintiff brought a medical malpractice action against the defendant and was awarded $355,000 in damages. The defendant filed bankruptcy and the plaintiff requested the Bankruptcy Court to hold the malpractice judgment nondischargeable un-

der § 523(a)(6). The Supreme Court held that since the defendant was reckless in causing the injury, but did not intend the injury, the debt was dischargeable.

■ The Supreme Court in *Geiger* made a distinction between acts done intentionally that cause injury and acts done with the actual intent to cause injury. Shifting its focus from the malice prong to the willful prong of § 523(a)(6), the Court held that the word "willful" modifies injury, indicating that nondischargeability requires a deliberate or intentional injury, not merely a deliberate act that causes injury. *Geiger* adopts a subjective standard of intent. The Eighth Circuit in the *Geiger* case applied a subjective test of whether the "debtor desires to cause the consequences of his act, or believes the consequences are substantially certain to result from it." *Geiger v. Kawaauhau,* 113 F.3d 848, 852 (8th Cir.1997). Adopting the Eight Circuit's interpretation of § 523(a)(6), the Supreme Court ruled when it considered *Geiger* that an act can be intentional, but "if the injury is unintended, it is neither desired nor in fact anticipated by the debtor." *Geiger,* —— U.S. at ——, 118 S.Ct. at 977. Thus, § 523(a)(6) requires us to focus on the subjective intent of the debtor to determine whether the injury was intended or unintended.

■ The Supreme Court in *Geiger* failed to address the malice prong of § 523(a)(6) of the Bankruptcy Code; however, lower courts earlier held that malice could be implied through the acts of the debtor. The Fourth Circuit Court of Appeals held there is no need to show specific malice on the part of the debtor in order for the debt to be nondischargeable pursuant to § 523(a)(6). *St. Paul Fire & Marine Insurance Co. v. Vaughn,* 779 F.2d 1003, 1009 (4th Cir.1985). Implied malice is sufficient under § 523(a)(6), which may be shown by the conduct and acts of the debtor in the context of their surrounding circumstances. *Id.* at 1010.

The Tenth Circuit held that to prove malice the creditor need not prove that the debtor specifically intended to injure him; the creditor must show the debtor's actual knowledge or the reasonable foreseeability that his conduct would result in injury to the creditor. *Britton,* 950 F.2d at 605 (citing *C.I.T. Fin. Serv., Inc. v. Posta (In re Posta)* 866 F.2d 364, 367 (10th Cir.1989)). The Fourth Circuit further defined the act of malice as one causing an injury without just cause or excuse, even though the debtor bears no spite, ill will or hatred. *First National Bank of Maryland v. Stanley (In re Stanley),* 66 F.3d 664, 667 (4th Cir.1995). In *Geiger,* the Supreme Court overturned this ruling and eliminated foreseeability from the definition of intent. Thus, in accordance with the Supreme Court, the interpretation of § 523(a)(6) is confined to an intentional tort standard. Although this Court is mindful of the historical precedent of § 523(a)(6), the Court must now decide this case within the framework of *Geiger.*

The Supreme Court has failed to provide guidance for applying its holding in *Geiger.* Since the *Geiger* opinion, this Court has not decided a claim of non-dischargeability under 11 U.S.C. § 523(a)(6). As a matter of first impression, the Court will act in accordance with other Circuits that have interpreted *Geiger* and apply a subjective standard of intent. In *In re Popa,* the First Circuit applied *Geiger* and held that an employer's failure to carry worker's compensation insurance was an intentional act that caused injury, but was not done with the actual intent to cause the injury, and therefore, the requirements of § 523(a)(6) were not satisfied. *Roumeliotis v. Popa (In re Popa),* 140 F.3d 317, 318 (1st Cir.1998). In *In re Tomlinson,* the Court held that a debtor's failure to turn over inventory proceeds, which were pledged to the creditor, in an effort to keep the business going was not an intentional act to cause injury within the meaning of § 523(a)(6), and the debt was therefore dischargeable. *Florida Outdoor Equipment v. Tomlinson (In re Tomlinson),* 220 B.R. 134, 137 (Bankr.M.D.Fla.1998).

■ Likewise, this Court must apply a subjective standard of intent and determine whether the debtor, Stewart M. Powers, intended to cause injury to the plaintiff, BB & T, by delivering his Portfolio Account to First Union when BB & T had a prior security interest in the account. First, the Court

must examine the intentional acts of the defendant. The defendant stipulated that he directed Paine Webber to deliver his Portfolio Account to First Union without advising BB & T. The defendant's transfer of funds was an intentional act done to subordinate the plaintiff's interest in the Portfolio Account to that of First Union. However, the debtor's intentional transfer of the plaintiff's collateral to First Union standing alone is not enough to satisfy the requirements of § 523(a)(6), when he asserted that the subordination would not injure BB & T's chances of being paid in full as he intended to pay its loan off over time. The debtor also expected to pay the First Union loan according to its terms which would have the effect of restoring the collateral to BB & T.

After *Geiger*, the Court must conduct an inquiry to determine whether the defendant intended to injure the plaintiff by this transfer of collateral from one creditor to another. The debtor's BB & T loan of $150,050.00 was due in full in November of 1996. However, at the same time of defaulting on the note held by the plaintiff, the defendant defaulted on the First Union $1,000,000 loan. As a result, the defendant was faced with the loss of his home through foreclosure by First Union. In an effort to save his house, the defendant delivered his Portfolio Account to First Union. First Union subsequently liquidated his Portfolio Account in January of 1997. Even after that occurred, the debtor made an additional payment and tendered others to BB & T.

Clearly, the defendant's act of subordinating the plaintiff's interest in his Portfolio Account was an improper act, but the Court is bound by the subjective intent of the debtor in determining whether the injury to the plaintiff was intended. However, the defendant's intent was to pay the plaintiff the balance due it, even though he subordinated its interest to First Union. In January 9, 1997, the defendant made a payment to BB & T of $12,023.32, including interest for November and December of 1996 and a $10,000 principal payment, which the plaintiff accepted. The plaintiff refused to accept any additional payments tendered by the debtor after January, 1997. The defendant's January payment and offers to make additional payments demonstrate his stated intent to pay BB & T and negates the theory that the defendant intended to cause the injury suffered by the plaintiff. Therefore, this Court finds that the defendant committed an intentional act that has caused injury to the plaintiff, but the defendant did not intend the injury. The debt due BB & T is dischargeable as defined by the Supreme Court in the *Geiger* decision. This result is evidenced by the subjective intent of the debtor to pay back the BB & T loan.

It is so ORDERED.