In re Jacqueline Witcher
GRANATI, Debtor.

Stone Street Capital, Inc.,
et al., Plaintiffs,

v.

Jacqueline Witcher Granati, Defendant.

Bankruptcy No. 00–14419–SSM.
Adversary Nos. 01–1025, 01-1061.

United States Bankruptcy Court,
E.D. Virginia,
Alexandria Division.

Sept. 1, 2001.

Elyse L. Wolf, Wechsler Selzer & Gurvitch, Bethesda, MD, for plaintiffs.

Jacqueline Witcher Granati, Stafford, VA, pro se.

## MEMORANDUM OPINION

STEPHEN S. MITCHELL, Bankruptcy Judge.

Before the court are cross-motions for summary judgment filed by Jacqueline Witcher Granati ("the debtor") and by Stone Street Capital, Inc., and Stone Street Services, Inc. (collectively, "Stone Street"), on June 15 and July 9, 2001, respectively.[1] A hearing was held on July 31, 2001, at which the debtor represented herself and Stone Street was represented by counsel.

Stone Street seeks a declaratory judgment that it is the owner of, or has a valid lien against, 216 monthly annuity payments of $800.00 each that the debtor assigned to Stone Street for a lump sum payment of $52,000. The annuity in question was issued in connection with a structured settlement of the debtor's claim for the wrongful death of her husband. Stone Street also seeks a ruling that the debtor's alleged conversion of payments totaling $23,200.00 constitutes a willful and malicious injury that renders liability for the converted funds nondischargeable under § 523(a)(6) of the Bankruptcy Code. In response, the debtor argues that a valid assignment never occurred because assignment was prohibited under the terms of the settlement agreement and annuity contract. The debtor also argues that the assignment agreement is unenforceable under the doctrines of unconscionability and unclean hands. For the reasons stated, the debtor's motion to dismiss will be denied, and Stone Street's motion for summary judgment will be granted in part and denied in part.

### Background

The debtor is a party to a structured settlement of her claim against a trucking company for the wrongful death of her husband, who was killed in 1983. The settlement agreement, which is dated February 14, 1985, requires the trucking company, through its insurer, Protective Insurance Company ("Protective"), to "arrange" to pay the debtor $800.00 per month commencing March 1, 1985, and continuing through February 1, 2015, or for the remainder of her life, whichever is longer.[2] The agreement further provides

---

1. The debtor's pleading, although entitled a motion to dismiss, is in substance a motion for summary judgment and will be treated by the court as such.

2. A separate lump-sum payment of $140,000.00 was made in payment of the debtor's attorney's fees.

that Protective would "secure" the payment obligation by purchasing an annuity contract from a life insurance company with the debtor designated as the "measuring life" under the contract, and that "[p]ayments made pursuant to said contract shall operate as a pro tanto discharge of the monthly obligations" under the settlement agreement. The settlement agreement contains no language either permitting or prohibiting the debtor from assigning the payments that would become due under the agreement.

On April 1, 1985, Protective purchased a single-premium annuity for $86,829.46 from First Colony Life Insurance Company ("First Colony"). The annuity policy designates the debtor as the "measuring life" and provides for payments of $800.00 per month for life, with 30 years guaranteed, beginning May 1, 1985. Protective is shown as the owner of the policy, and the debtor is listed as the "person(s) to whom annuity payments are to be made payable." The policy further provides, "The Owner has the right at any time to designate to whom annuity payments will be made." Finally, the policy provides as follows with respect to assignment:

> ASSIGNMENT. The Company is not responsible for the validity or effect of any assignment of this Contract. No assignment will bind the Company until it is received at the home office. The rights of the Owner are transferred to the assignee to the extent of the assignee's interest.

After receiving monthly payments for twelve years, the debtor contacted Stone Street to inquire about selling her remaining interest in the structured settlement in exchange for a lump-sum payment.[3] In her interrogatory responses the debtor states that she had a number of discussions with a Mr. Rick Stanley at Stone Street, who represented that he was an attorney, and who repeatedly assured her that she had the right to sell the annuity payments. In any event, it is undisputed that on March 21, 1997, the debtor and Stone Street entered into a written "Annuity Purchase Agreement" whereby Stone Street paid the debtor a lump sum of $52,000.00 in exchange for the remaining 216 annuity payments that would be paid from May 1, 1997 to April 1, 2015.[4] To address the possibility that First Colony might not honor an assignment, the agreement further required the debtor to instruct First Colony to mail the annuity payments to a lockbox address designated by Stone Street for deposit into an account in the debtor's name but under Stone Street's control. The debtor was also required to provide a specimen signature for a signature stamp that Stone Street could use to endorse checks received from First Colony. Other documents signed by the debtor at the same time included a "Guaranty Agreement" under which she guaranteed the payments due from First Colony; a "Security Agreement" under she granted a security interest in any payments received from First Colony to secure her obligations under the Guaranty Agreement; and a "Seller's Affidavit" in which, among other things, she acknowledged that the Annuity Purchase Agreement

---

3. Stone Street Capital, Inc., is a "factoring company" that purchases future payments due lottery winners and beneficiaries of structured settlements. Stone Street Services, Inc., is the entity that services the assignment contract.

4. In her interrogatory responses, the debtor states that the $52,000.00 she received from Stone Street was used "to purchase a mobile home, part to pay off then existing bills, about a thousand dollars ... for some new personal items, and the rest ... to start a taxicab business to replace the lost annuity payments."

might violate restrictions on assignability contained in the underlying settlement agreement.

Stone Street received payments under this arrangement for approximately 21 months. However, in March 1999, the debtor directed First Colony to stop sending the payments to the lockbox and directed them instead to an account under her control. She explains that she did so because "the circumstances of illness and a failed business" left her destitute and in need of the money. She made two $200.00 payments to Stone Street out of the annuity payments but otherwise has kept and spent the annuity payments for April 1999 and subsequent months.

Stone Street responded by filing a bill of complaint against the debtor in the Circuit Court for Prince William County on September 29, 1999.[5] The bill of complaint asserted that the debtor's conduct in diverting the funds that she had assigned to Stone Street constituted a breach of contract, breach of fiduciary duty, fraud, and conversion. The relief sought included imposition of a constructive trust, an injunction to compel the debtor to pay over future annuity payments, and money damages for breach of contract and conversion. Additionally, Stone Street sent a letter to First Colony on September 29, 1999, requesting that the annuity payments be sent directly to Stone Street. On November 9, 1999, First Colony replied directly to the debtor, with a copy to Stone Street:

> We are writing you in response to a letter dated September 29, 1999 that we received from Stone Street Capital.

The letter indicated that you had assigned 216 payments from the above-referenced annuity to Stone Street Capital. We forward [*sic*] this information to the owner of your contract, Protective Insurance Company, for approval. Protective Insurance has informed us that if they approve your request it would violate the terms of your settlement agreement. Therefore, your request has been denied.

Approximately a year later, Stone Street moved the Circuit Court for partial summary judgment to require the debtor to deposit into the court's registry any annuity payments she received pending a final ruling. The Circuit Court granted that motion by order dated October 27, 2000. The debtor, however, did not comply with that order and instead filed a chapter 7 petition in this court two weeks later (November 4, 2000), thereby staying the Circuit Court proceedings. In her schedules, the debtor listed as an asset "First Colony Life Insurance 800 for Personal injury Settlement 1985," which she valued at $1.00 and claimed exempt under Va.Code Ann. § 34–28.1 in the same amount.

On January 9, 2001, Stone Street filed an objection to the debtor's claimed exemption of the annuity payments. It then filed on February 8, 2001, the present complaint to determine that its claim against the debtor for the diverted payments is nondischargeable under 11 U.S.C. §§ 523(a)(2)(A), (a)(4), and (a)(6), and to obtain declaratory relief that Stone Street is either the owner of, or has a valid security interest in, the annuity payments.[6]

---

**5.** For reasons that are unexplained, the complaint and subpoena in chancery were not served on the debtor until June 13, 2000, some 8 months later. The debtor filed a timely answer on June 24, 2000.

**6.** Contemporaneously with the filing of the nondischargeability complaint, Stone Street

also filed a motion for relief from the automatic stay in this court seeking (a) to liquidate its damage claim in the Prince William County Circuit Court, and (b) to enforce the October 27, 2000, Circuit Court order, or, in the alternative, obtain adequate protection for its interest in the monthly annuity payments.

The debtor, who is representing herself, filed a timely answer disputing Stone Street's right to the requested relief.

*Discussion*

I.

As noted, Stone Street seeks a declaratory judgment that it is the owner of, or has a valid lien against, the remaining payments due under the annuity and settlement agreement. The complaint further seeks a ruling that the debtor's liability for the $23,200.00 in payments she diverted from Stone Street to herself is nondischargeable under § 523(a)(6) of the Bankruptcy Code as a willful and malicious injury to Stone Street.[7]

Under Rule 56(c), Federal Rules of Civil Procedure, as incorporated by Federal Rule of Bankruptcy Procedure 7056, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In ruling on a motion for summary judgment, a court should believe the evidence of the non-movant, and all justifiable inferences must be drawn in his favor. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). At the same time, the Supreme Court has instructed that summary judgment "is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986). Additionally, not every dispute as to the facts will preclude the entry of summary judgment, but only those disputes over facts that might affect the outcome of the suit under the governing law. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 248, 106 S.Ct. at 2510.

II.

The court must first determine whether Stone Street is the owner of, or has a valid security interest in, the annuity payments. The answer to this question depends on whether the debtor's right to the annuity payments is assignable, since if they are not, no property interest passed to Stone Street by virtue of the attempted assignment, and Stone Street's claim against the debtor is simply a contract claim, which (absent a showing that she entered into the contract with fraudulent intent) is dischargeable. *See Dorfman v. Moorhous (In re Moorhous),* 180 B.R. 138 (Bankr. E.D.Va.1995), *aff'd* 108 F.3d 51 (4th Cir. 1997) (statutory restriction prevented assignee of retired officer's pension from acquiring ownership rights to such pay).

A.

As a general proposition, contract rights are freely assignable unless

---

The court initially granted a partial lifting of the automatic stay. However, on the debtor's motion for reconsideration, the court ruled that the stay of the state court suit should remain in effect pending the trial of this adversary proceeding. *Stone Street Services, Inc. v. Granati (In re Granati),* No. 00–14419, (Bankr.E.D.Va., April 9, 2001). The plaintiffs then removed the state court suit to this court under 28 U.S.C. § 1452(b). *Stone Street Services, Inc. v. Granati,* A.P. No. 01–1061. That action has been consolidated with the present action for the purpose of determining common issues of fact and law.

7. The complaint, as noted, alleges additional grounds of nondischargeability; however, the motion for summary judgment seeks a ruling solely on the § 523(a)(6) issue.

the identity of the contracting parties is material or unless assignment is precluded by the terms of the contract itself or by public policy. Restatement of Contracts (Second) § 317 (1979). As noted above, the settlement agreement between the debtor and the trucking company is completely silent as to assignment of the payments due under that agreement. The Annuity Purchase Agreement, however, does not purport to assign the debtor's rights to payment under the settlement agreement with Protective and its insured, but rather under the annuity policy issued by First Colony. The annuity policy, although it addresses and appears to contemplate that the *ownership* rights might be assigned, does not specifically address assignment of the annuitant's rights.

The difficulty, of course, is that the debtor, although designated as the payee (or annuitant) under the annuity policy, was not its owner. Protective, as the owner, was the only party to whom First Colony was contractually bound. Additionally, under the express terms of the policy Protective had the right "at any time to designate to whom annuity payments will be made." Under settled law in this Circuit, it seems clear that because the debtor was not the owner of the policy, she had no power to make a valid legal assignment of the payments becoming due under that policy. *See Allstate Ins. Co. v. American Bankers Ins. Co. of Florida,* 882 F.2d 856 (4th Cir.1989).

In *Allstate,* an annuity policy was issued as part of a structured settlement of a personal injury claim by one Deisher. Deisher was named as the annuitant, but the tortfeasor's insurance company, Allstate, was named as the owner of the policy (which was issued by an affiliate of Allstate). *Id.* at 858. Later, Deisher agreed to a collateral assignment of the remaining payments under the policy to indemnify the surety on a $75,000.00 bail bond for his friend, one Kosko. *Id.* As here, the annuity policy contained no language either prohibiting or permitting Deisher to assign his right to receive payments. *Id.* When Kosko failed to appear for trial and the bail bond was forfeited, the surety demanded reimbursement from Deisher and Allstate. *Id.* at 859. Deisher responded by bringing an action in the U.S. District Court for the Western District of Virginia for rescission of the assignment on the ground that it was not valid. *Id.*

After the trial court ruled in favor of Deisher, the surety appealed, and the Court of Appeals affirmed. With respect to the issue of whether there had been a valid legal assignment, the Court held as follows:

> It is axiomatic that one may not sell, assign or hypothecate that which he does not own. Deisher had no ownership in the annuity itself. The annuity policy plainly stated ... that Allstate Insurance was the owner of the annuity. Thus, Deisher could not lawfully assign that annuity, wherefore the purported assignment did not constitute a valid legal assignment.

*Id.* at 859–60. Like the trial court, the Court of Appeals recognized that, even though there was no valid *legal* assignment, the attempt at assignment might nevertheless "create an [enforceable] *equitable* interest in the promissee by virtue of a right to specific performance of the promise." *Id.* at 860 (emphasis added) (citation omitted). Under the facts before it, the Court of Appeals concurred with the District Court that specific performance was not appropriate, first because the surety knew, before the assignment was executed, that Allstate took the position that Deisher had no right to assign payments; and second, because Deisher's liability as subsurety on the bail bond had

been unfairly enlarged when, without his knowledge, Kosko was indicted on a more serious charge but was allowed to remain free on the same bond. *Id.* at 860–62.

### B.

It is a close question whether recognition of an equitable assignment is appropriate in this instance. In *Allstate,* the assignee's knowledge, prior to entering into the transaction, that the annuity issuer took the position that there was no right to assign payments, was a significant factor weighing against specific performance. *Id.* at 860. Although there is no evidence here that Stone Street made any actual inquiry of First Colony prior to entering into the Annuity Purchase Agreement, the very warp and woof of the transaction and its documentation evidence a clear awareness that First Colony would likely decline to honor the assignment. Hence, the necessity for the debtor to direct the payments to a lockbox and account in her name but under Stone Street's control. It is true that Stone Street parted with a significant sum of money in exchange for the assignment, but the surety in *Allstate* assumed an obligation every bit as large in reliance on Deisher's assignment. The only difference is that the debtor here received a direct monetary benefit from the assignment in the form of the $52,000.00 payment, while the benefit to Deisher from his assignment was not monetary but merely the satisfaction of seeing his friend released on bail.

In her motion to dismiss, the debtor urges that the assignment to Stone Street should not be enforced because the transaction was unconscionable and because Stone Street is guilty of unclean hands. Since the Annuity Purchase Agreement states that it is governed by Pennsylvania law, the court looks to the law of that state for guidance. *See Union Central Life Ins. Co. v. Pollard,* 94 Va. 146, 151–52, 26 S.E. 421, 422 (1896); *but see In re Terry,* 245 B.R. 422 (Bankr. N.D.Ga.2000) (court looks to law of state in which underlying structured settlement agreement was entered to determine rights under assigned annuity). Unconscionability is characterized by "an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party." *Germantown Manufacturing Co. v. Rawlinson,* 341 Pa.Super. 42, 491 A.2d 138, 145 (1985) (*quoting* E.A. Farnsworth Contracts 314 (1982)). Further, the standard of conduct contemplated by the unconscionability doctrine is good faith, honesty in fact, and observance of fair dealing. *See Id.* Finally, the party challenging the contract has the burden of proving unconscionability. *See Bishop v. Washington,* 331 Pa.Super. 387, 480 A.2d 1088 (1984).

In her pleadings, the debtor does not contend that the underlying financial terms were unreasonably favorable to Stone Street.[8] Nor has the debtor alleged,

---

8. That the terms were, nevertheless, quite favorable to Stone Street is hardly open to question. Under the deal Stone Street struck with the debtor, it purchased 216 monthly payments of $800.00 each—a total of $172,800.00 in payments—for $52,000.00. There is, of course, a time value to money represented by the concept of "present value," which is simply a recognition that the economic value of a dollar to be received in the future is less than the value of a dollar today. *See In re Birdneck Apt. Assocs. II, L.P.,* 156 B.R. 499, 507 (Bankr.E.D.Va.1993). To reduce a stream of future payments to present value, a discount rate is applied to the future payments. The choice of a proper discount rate is not always obvious, since it represents the rate of return that might have been earned had the funds been available for immediate investment. The court observes, however, that the Code of Virginia uses an 8% discount rate for the purpose of commuting

in her interrogatory answers or by affidavit, that she was misled as to the financial terms of the transaction or that she did not understand the essential nature of the transaction. Rather, the debtor argues that the assignment was unconscionable because a Stone Street representative falsely assured her that she could "follow her dreams" by assigning her structured settlement free from any interference or objection by First Colony. Additionally, the debtor argues that enforcement of the assignment would be contrary to equity and good conscience because she is now destitute and needs the annuity payments in order to supply her basic needs.

In support of the latter point, the debtor points to her bankruptcy schedules, a portion of a recent bank statement, a Social Security statement of earnings, and a portion of a Social Security appeal decision. The bankruptcy schedules reflect combined monthly take-home from employment, the annuity, and Veteran's benefits of $1,623 and monthly living expenses of $1,594. The bank account statement reflects only a marginally-higher monthly income of $1,675.07 ($800.00 from the annuity, $541.07 in wages from the debtor's job as a school bus driver, and $334.00 in Veterans benefits). An excerpt from a decision of the Social Security Administration Office of Hearings and Appeals dated November 27, 1998, states that the debtor, although not qualifying for Social Security disability payments, nevertheless suffers to a "severe" extent from hypertension, chronic obstructive pulmonary disease, bronchial asthma, and generalized osteoarthritis. Her earnings subject to Social Security tax were $4,657 in 1998 and $3,641 in 1999.

That the debtor is in dire financial straits is hardly open to question. Nevertheless, the court is aware of no rule of equity that permits a sale to be rescinded simply because the seller, after spending the money received, needs the asset back. While the sales terms were favorable to Stone Street, the sales price was not so grossly inadequate as to shock the conscience; and, as noted, there is no evidence that the essential financial terms were not fully disclosed.

The debtor is on somewhat firmer ground in asserting that Stone Street misrepresented her right to assign the annuity payments. As discussed above, *Allstate* is binding authority within this Circuit that she could not make a valid *legal* assignment of the annuity payments. Yet, even *Allstate* acknowledged that a valid equitable assignment might result, notwithstanding an annuitant's lack of power to make a legal assignment. The question here is whether this court should exercise its power to decree an equitable assignment. The issue is admittedly not free from doubt. On the one hand, Stone Street, which is in the business of buying lottery winnings and structured settlements, had to have known that the debtor's legal right to assign the annuity payments was at the very least highly questionable. Given that Stone Street entered into the transaction with its eyes fully open, it is difficult to see why it is entitled to a special claim on this court's equitable powers, any more than was the surety in *Allstate*. At the same

---

the present value of a life estate. *See* Va.Code Ann. § 55–269.1 *et seq.* Assuming, without deciding, that an 8% discount rate would be appropriate here, a stream of 216 monthly payments in the amount of $800.00 each would have a present value of $91,432.48, or almost twice what Stone Street paid. Ana-

lyzed somewhat differently, if the transaction were compared to a loan of $52,000.00 repayable in 216 monthly installments of $800.00 each, the Annual Percentage Rate as defined under Regulation Z implementing the Federal Truth in Lending Act would be 17.68%.

time, the debtor, notwithstanding any assurances she might have received from Stone Street that she was free to "follow her dreams," can hardly plead that she was unaware that assignment was at least problematical. The seller's affidavit she signed as part of the transaction expressly acknowledged her awareness that assignment might violate the terms of the settlement agreement or annuity. So she too entered into the transaction with her eyes open. On balance, the court concludes that the equities here slightly favor Stone Street, since it provided what it promised, and there is no assertion that the $52,000.00 it paid was not a substantial benefit at the time it was received. By contrast, to allow the debtor to keep both the $52,000.00 *and* the annuity payments she agreed to sell would plainly constitute unjust enrichment.

### C.

██ Recognition of an equitable assignment does not end the inquiry, however. While a legal assignment creates a property interest that is not affected by the assignor's subsequent discharge in bankruptcy, an equitable assignment is at bottom simply a right to an equitable remedy. The problem is that a right to an equitable remedy, if it constitutes a "claim," is subject to discharge in bankruptcy just like any other claim unless it falls within one of the specific statutory exceptions to discharge.

A chapter 7 discharge discharges a debtor from all prepetition "claims" except for those specified in Section 523(a), Bankruptcy Code. § 727(b), Bankruptcy Code. The Bankruptcy Code's definition of "claim" is very expansive:

(5) "claim" means—

(A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent,

matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or

(B) *right to an equitable remedy for breach of performance if such breach gives rise to a right to payment,* whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured[.]

§ 101(5), Bankruptcy Code (emphasis added). The Supreme Court has repeatedly held that in enacting the Bankruptcy Code, Congress intended to adopt the broadest possible definition of a "claim." *See Johnson v. Home State Bank,* 501 U.S. 78, 83, 111 S.Ct. 2150, 2154, 115 L.Ed.2d 66 (1991); *Pennsylvania Department of Public Welfare v. Davenport,* 495 U.S. 552, 558, 110 S.Ct. 2126, 2130, 109 L.Ed.2d 588 (1990), *Ohio v. Kovacs,* 469 U.S. 274, 279, 105 S.Ct. 705, 708, 83 L.Ed.2d 649 (1985). The plain language of § 101(5) includes certain equitable rights within the classification of a "claim" in a bankruptcy case. For example, in *Kovacs,* the Court was confronted with the issue of whether an injunction against the debtor to clean up a hazardous waste site could be treated as a "debt" subject to discharge in the debtor's bankruptcy. *Kovacs,* 469 U.S. at 275, 105 S.Ct. at 706. The Court held that the debtor's liability under the injunction obtained by the state was indeed a "debt" (i.e., a "liability on a claim") that was subject to being discharged. *Id.* at 282–83, 105 S.Ct. at 709–10. The Court reasoned that because the state had appointed a receiver pre-petition to clean up the site after the debtor failed to do so, all that was left to recover against the debtor was a monetary award. *Id.,* 105 S.Ct. at 709–10. Citing to the legislative history of § 101(5)(B), the Court noted the following:

Section 101( [5] )(B) ... is intended to cause the liquidation or estimation of

contingent rights of payment for which there may be an alternative equitable remedy with the result that the equitable remedy will be susceptible to being discharged in bankruptcy. For example, in some States, a judgment for specific performance may be satisfied by an alternative right to payment in the event performance is refused; in that event, the creditor entitled to specific performance would have a "claim" for purposes of a proceeding under title 11. *Id.* at 280, 105 S.Ct. at 708 (original source omitted) (omission in original); *see also United States v. LTV Corp. (In re Chateaugay Corp.)*, 944 F.2d 997, 1007–08 (2d Cir.1991) (noting that an obligation stemming from an order to clean up a site from environmental hazards is a "claim" potentially subject to discharge while an injunction against future pollution cannot be converted to a monetary obligation, and therefore, is not a claim); *TKO Properties, LLC v. Young (In re Young )*, 214 B.R. 905, 911–12 (Bankr.D.Idaho 1997) (holding that an entity's right to specific performance against the debtor under a contract for the sale of land is a "claim" under § 101(5)(B) because state law allows both the equitable remedy of specific performance and money damages for breach of a sales contract); *Calumet Farm, Inc. v. Northern Equine Thoroughbred Productions Ltd. (In re Calumet Farm, Inc.)*, 150 B.R. 403, 411–12 (Bankr.E.D.Ky.1992) (reasoning that the equitable remedy of specific performance "likewise is provable as an unsecured claim" under § 101(5)(B)); *but see In re Printronics, Inc.*, 189 B.R. 995, 1001–02 (Bankr.N.D.Fla.1995) (holding that a covenant not to compete cannot be transformed into a claim for future damage, and is not a "claim" under the Code).

Having considered the issue, the court concludes that Stone Street's right to specific performance of the Annuity Purchase Agreement is more closely analogous to a right to enforce an injunction against future pollution that was discussed in *Chateaugay* or against violation of a covenant not to compete that was the subject of *Printronics* than to the injunction to clean up existing pollution that was addressed in *Kovacs*. It is true, of course, that the subject of the Annuity Purchase Agreement is not a unique asset, such as land or a piece of artwork, but rather a payment stream fixed as to amount and duration. It could plausibly be argued, therefore, that since the damages resulting from the breach of the Annuity Purchase Agreement are neither uncertain nor difficult to ascertain, they are fully compensable by a judgment for money damages, with the result that Stone Street's right to an equitable remedy would fall within the broad definition of a "claim." On the other hand, the reported bankruptcy decisions in this and other districts, while not specifically discussing the issue, seem to have uniformly treated equitable assignments of personal injury proceeds and structured settlements not as dischargeable claims but rather as property interests. *See Pollock v. Gandara (In re Gandara)*, 218 B.R. 808 (Bankr.E.D.Va.1997) (holding that debtor's retention of personal injury proceeds she had assigned to chiropractor as security for his charges constituted conversion); *In re Terry*, 245 B.R. 422 (Bankr.N.D.Ga. 2000) (future annuity payments debtor had assigned to factoring company were not property of the bankruptcy estate); *Jones v. J.G. Wentworth S.S.C. Ltd. P'ship (In re Berghman)*, 235 B.R. 683 (Bankr.M.D.Fla. 1999) (right which debtor had sold to factoring company to receive annuity payments under a structured settlement was not property of the bankruptcy estate). Accordingly, the court concludes that Stone Street's right to specific enforcement of the Annuity Purchase Agreement

is not a claim and has not been discharged.[9]

### III.

Because the subject of the Annuity Purchase Agreement was the debtor's right to payments under the annuity policy, and not her right to payments under the settlement agreement, it is not strictly necessary for the court to reach the issue of whether those payments were separately assignable. Some brief discussion is nevertheless appropriate, since certain of the arguments raised by the debtor more properly concern the settlement agreement than the annuity policy.

### A.

As noted, the settlement agreement requires Protective and its insured to pay the debtor $800.00 per month for her life or for 30 years, whichever is greater. Although the agreement requires Protective to purchase an annuity as security for the promise to pay, the annuity is not substituted for the promise to pay. As also noted, the settlement agreement contains no language restricting the debtor from assigning her rights to payment. The debtor strenuously contends, however, that the November 9, 2000, letter from First Colony plainly establishes that the payments are nonassignable. The letter, to be sure, is original evidence as to First Colony's refusal to honor the assignment. However, it is hearsay as to Protective's reason for refusing to consent to the assignment, and it is both hearsay and not the best evidence as to the reason given for such refusal, namely that if Protective were to consent, "it would violate the

terms of [the] settlement agreement." For that reason, the First Colony letter is not competent evidence to prove that assignment would violate the terms of the settlement agreement. Furthermore, the settlement agreement itself is before the court, and there is simply no language in the agreement prohibiting or limiting assignment of the payments that Protective and its insured agreed to make to the debtor.

### B.

The question then arises whether there is a statutory or public policy prohibition against assignment of contract rights arising under an agreement to settle a wrongful death claim. In Virginia, the assignment of a cause of action for personal injury was prohibited at common law. *See Tyler v. Ricamore,* 87 Va. 466, 468, 12 S.E. 799 (1891) ("every demand connected with a right of property, real or personal, is assignable . . ., while it is otherwise with rights of action for injuries to the person, etc."); *City of Richmond v. Hanes,* 203 Va. 102, 106, 122 S.E.2d 895 (1961) ("The general doctrine, both at law and in equity, is that rights of action for torts causing injuries which are strictly personal . . . are not capable of being assigned[.]"); Va.Code Ann. § 8.01–26 ("Only those causes of action for damage to real or personal property, whether such damage be direct or indirect, and causes of action ex contract "are assignable."). However, an injured person or his estate in Virginia may now by statute make "a voluntary assignment of the proceeds or anticipated proceeds of any court award or settlement *as security for*

---

9. Because the court concludes that Stone Street is the equitable owner of the assigned payments, the court need not reach Stone Street's alternate argument that it has a valid security interest in the payments to secure the debtor's obligations under the guaranty agree-

ment. The court only notes that exactly the same legal and equitable principles apply to the purported grant of a security interest as to the purported sale, since one cannot grant an effective security interest in property that one does not own.

*new value given* in consideration of such voluntary assignment." Va.Code Ann. § 8.01–26 (emphasis added). Additionally, there is a distinction between assignment of a personal injury *cause of action*, and the assignment of the *proceeds* from the settlement of that cause of action. *See Community Hosp. of Roanoke Valley, Inc. v. Musser (In re Musser)*, 24 B.R. 913, 920 (W.D.Va.1982). The latter may be the subject of a valid assignment even if the cause of action itself is not. *Id.; see also In re Gandara*, 218 B.R. at 811 ("Assignment of the proceeds of a personal injury cause of action to a health care provider is permitted under Virginia law.").

■ To be sure, in Virginia the proceeds from a personal injury or wrongful death settlement are *exempt* from creditor process. Va.Code Ann. § 34–28.1. Merely because property is exempt, however, does not prevent it from being sold or from being voluntarily pledged as collateral. Indeed, the very statute that creates the exemption for wrongful death settlements also specifically provides that such exemption "shall not be construed to affect any voluntary assignment of the proceeds or anticipated proceeds of a personal injury or wrongful death award or settlement as permitted by § 8.01–26." *Id.*

## C.

■ The final question then is whether there is something special in the nature of a structured settlement that would invalidate an assignment of the right to future payments. A "structured" settlement is simply one in which the injured party agrees to accept compensation in the form of periodic payments rather than all at once. *See* Va.Code Ann. § 59.1–475 (" 'Structured settlement' means an arrangement for periodic payment of damages for personal injuries established by settlement or judgment in resolution of a tort claim or for periodic payments in settlement of a workers' compensation claim."). As one commentator has explained,

> In designing a personal injury settlement agreement, there are compelling reasons to avoid compensating the plaintiff with a single lump sum cash award. One of the most important reasons is that plaintiffs are often unable or unwilling to effectively manage a large lump sum award. Statistics show that twenty-five to thirty percent of all cash judgment or settlement awards are exhausted within two months, and ninety percent are exhausted within five years. Prematurely exhausting a settlement award can be particularly troublesome if the plaintiff is relying on the award for future medical or living expenses. * * * In the typical structured settlement agreement, the defendant pays a structured settlement company a lump sum amount, and in exchange, the structured settlement company provides the plaintiff with payments over time. The timing and amount of those payments can be designed to meet the plaintiff's future needs. For example, payments can be designed to simulate lost wages or to coincide with anticipated future medical expenses.

Leo Andrada, Note, *Structured Settlements: The Assignability Problem*, 9 S. Cal. Interdisciplinary L.J. 465, 465 (2000). Because the underlying purpose of a structured settlement is not only to compensate an injured party but also to protect the party from his or her own improvidence, a number of commentators, courts, and legislatures have become concerned by the growing number of companies, sometimes called "factoring companies," that "purchase" structured settlements from personal injury victims by paying the victim

immediate cash for the right to future payments under the settlement. *Id.* While formally documented as a purchase, "[i]n practice, the transaction resembles a loan, where the factoring company lends money to be repaid later, plus interest." *Id.* at 472. The effective interest rate is often quite high compared to conventional loan transactions. *Id.* at 473 (citing report by the leading factoring company that its effective interest rate is about 21% per year). Additionally, at least one court has held that factoring companies should not be permitted to take advantage of the federal tax incentives that are tailored to encourage beneficiaries to use structured settlements. *See Wentworth v. Jones,* 28 S.W.3d 309, 313 (Ky.Ct.App.2000); *see also Grieve v. General American Life Insurance Co.,* 58 F.Supp.2d 319, (D.Vt.1999) (holding that policy considerations support the enforcement of anti-assignment clauses against recipients of payments under a structured settlement); *Henderson v. Roadway Express,* 308 Ill.App.3d 546, 242 Ill.Dec. 153, 720 N.E.2d 1108 (1999) (holding that anti-assignment provision in structured settlement agreement was valid and enforceable), *appeal denied,* 188 Ill.2d 564, 246 Ill.Dec. 123, 729 N.E.2d 496 (2000); *but see State Farm Life Ins. Co. v. Florida Asset Financing Corp.,* 786 So.2d 1 (Fla. Dist.Ct.App.2000) (declining to hold that sale of future annuity payments due under structured settlement violates public policy). In response to these concerns, twelve states, among them Virginia, have in recent years enacted statutes regulating the transfer of structured settlement payments. The Virginia statute, which became effective July 1, 1999, provides as follows:

> No direct or indirect transfer of structured settlement payment rights shall be effective and no structured settlement obligor or annuity issuer shall be required to make any payment directly or indirectly to any transferee of structured settlement payments rights unless the transfer has been authorized in advance in a final order of a court of competent jurisdiction or a responsible administrative authority[.]

Va.Code Ann. § 59.1–476(A). As a condition of approving the transfer, the court must find that the transferee has disclosed, among other things, the "discounted present value of [the payments being transferred], together with the discount rate used in determining such discounted present value," as well as "the quotient (expressed as a percentage) obtained by dividing the net payment amount by the discounted present value of such payments." *Id.* The court must also make a finding that "[t]he best interests of the payees and the payees' dependents render the transfer appropriate." *Id.*

As noted, the Virginia statute regulating the transfer of structured settlement payments became effective more than two years after the debtor entered into the Annuity Purchase Agreement with Stone Street.[10] Additionally, it would appear

10. The contract between the debtor and Stone Street contains a choice of law provision stating that it is governed by the law of Pennsylvania. Like Virginia, Pennsylvania has enacted legislation requiring court approval for the transfer of structured settlement payment rights:

> No transfer of structured settlement payment rights shall be effective ... unless the payee has filed a petition requesting such

transfer and the petition has been granted by final order or decree of a court of competent jurisdiction.

Pa. Cons.Stat. Ann., § 4003 (2000). However, this statute, like the Virginia statute, was enacted after the debtor and Stone Street entered into the assignment agreement in 1997. Additionally, the court has been unable to locate any reported decision by a Pennsylvania court holding that the assign-

that the Virginia statute has now expired.[11] Finally, the court's research has not discovered any reported Virginia case holding that a transfer of structured settlement payments is contrary to public policy. Accordingly, the court concludes that there is, at least at present, no public policy bar in Virginia to assignment of structured settlement payments. Additionally, since the structured settlement agreement with Protective does not contain anti-assignment language, the court need not reach the issue of whether such a restriction should be given effect.

## IV.

The court must next address the issue of dischargeability as to those annuity payments the debtor kept and spent after she directed First Colony to stop sending the payments to the address provided by Stone Street.

### A.

 With respect to the payments the debtor kept *subsequent* to the filing of the bankruptcy petition, a tort action by Stone Street for damages resulting from the conversion of Stone Street's property would be a post-petition claim and therefore unaffected by the debtor's discharge. This is true only of a cause of action for conversion, since a bankruptcy discharge does not extinguish property interests.

Since the contract between Stone Street and the debtor was entered into prior to the bankruptcy filing, any cause of action in the nature of a breach of contract is discharged—regardless of whether the breach occurred before or after the filing of the bankruptcy petition—unless Stone Street prevails on its separate count, not at issue on the present motion, that the debtor entered into the contract with fraudulent intent.

### B.

The more difficult question concerns the payments—apparently $15,600.00 in amount—that the debtor kept prior to the filing of the bankruptcy petition. As to these, Stone Street asserts that under the undisputed facts, the debtor's liability is nondischargeable as a "willful and malicious injury" to its property. § 523(a)(6), Bankruptcy Code.

 "Willful," as used in § 523(a)(6), requires an intentional injury, not merely an intentional act that results in injury. *See Kawaauhau v. Geiger,* 523 U.S. 57, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998). The requirement that the conduct be "malicious," however, does not require that a debtor bear subjective ill will toward the creditor; it is sufficient that a debtor's injurious act is done "deliberately and intentionally in knowing disregard of the rights of another." *First Nat'l Bank of*

---

ment of a structured settlement is void solely on public policy grounds.

**11.** The act enacting the statute provided that its provisions would expire on July 1, 2001, "unless federal legislation has been enacted by such date establishing a federal standard applicable to transfers of structured settlement payment rights." At the time the Virginia statute was enacted, Congress had before it a bill, the Structured Settlement Protection Act, H.R. 263, 106th Cong. (1999), which would have imposed a 50% excise tax on any sale of structured settlement payments except

those approved by a court. That bill was not enacted. Other bills have been introduced having the same general object. *See* S. 1045, 106th Cong. (1999); H.R. 5421, 106th Cong. (2000); S. 3152, 106th Cong. (2000); and H.R. 1514, 107th Cong. (2001). So far as the court has been able to determine, however, no federal statute has been enacted establishing "a federal standard applicable to transfers of structured settlement payment rights." Accordingly, the Virginia statute would appear to have been effectively repealed by its own terms as of July 1, 2001.

*Md. v. Stanley (In re Stanley)*, 66 F.3d 664, 667 (4th Cir.1995). In this connection, conversion can constitute a willful and malicious injury to property for the purpose of § 523(a)(6). *See Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 331–332, 55 S.Ct. 151, 153, 79 L.Ed. 393 (1934) (dicta) (decided under former Bankruptcy Act of 1898); *Harmon v. Scott (In re Scott)*, 203 B.R. 590, 598 (Bankr.E.D.Va.1996); *Richmond Metropolitan Hosp. v. Hazelwood (In re Hazelwood)*, 43 B.R. 208, 213 (Bankr. E.D.Va.1984). As the Supreme Court cautioned in *Davis*, however,

> [A] willful and malicious injury does not follow as of course from every act of conversion, without reference to the circumstances. There may be a conversion which is innocent or technical, an unauthorized assumption of dominion without willfulness or malice. There may be an honest but mistaken belief, engendered by a course of dealing, that powers have been enlarged or incapacities removed. In these and like cases, what is done is a tort, but not a willful and malicious one.

*Davis*, 293 U.S. at 332, 55 S.Ct. at 153 (internal citations omitted); *see also Branch Banking & Tr. Co. v. Powers (In re Powers)*, 227 B.R. 73 (Bankr.E.D.Va. 1998) (post-*Geiger* decision holding that debtor's conversion of bank's collateral by delivering it to another creditor was not a willful and malicious injury where debtor did not intend to injure the bank and intended to pay the debt in full).

■■■ Since the court has determined that a valid equitable assignment occurred, there can be little doubt that the debtor's redirection of the payment stream to her personal bank account and her expenditure of those funds for her own benefit constituted a conversion of Stone Street's property.[12] The initial inquiry, then, is whether it was "willful" as that term was explained by the Supreme Court in *Geiger*. *Geiger* was a medical malpractice case in which the debtor-physician was determined to have recklessly failed to prescribe a medically-appropriate course of treatment, with the result that the patient's leg had to be amputated. There was no evidence, however, that Dr. Geiger intended for his patient to lose her leg. The Supreme Court ruled that such reckless conduct, without an actual intent to cause injury, did not constitute a "willful" injury for the purpose of § 523(a)(6).

■■■ Here, the debtor's redirection of the settlement payments to her own account and her expenditure of those funds for her own benefit were clearly intentional acts. The debtor does not dispute that she acted intentionally, but rather seeks to avoid a finding of willful injury by arguing that a valid assignment never occurred; that Stone Street has received a substantial number of payments; and that she believed she needed to pay Stone Street only as long as she was financially capable of doing so. Even assuming, however, that the debtor sincerely believed that Stone Street should not be entitled to collect the annuity payments when she had a superior need for them, such a belief would not make her conduct any less "willful" for the purpose of § 523(a)(6). *Johnson v. Davis (In re Davis)*, 262 B.R. 663 (Bankr. E.D.Va.2001) (act is "willful" if intentional and "substantially certain to result in injury").

---

12. "Conversion" has been described as an unauthorized exercise of ownership over goods belonging to another to the exclusion of the owner's rights. *See In re Powers*, 227 B.R. at 75. Further, in establishing conversion for the purposes of § 523(a)(6), courts look for "an act of dominion or control wrongfully asserted over another's property inconsistent with his ownership of it." *In re Hazelwood*, 43 B.R. at 213.

■ As noted, an injury to property must be "malicious" as well as willful before the resulting debt will be excepted from discharge under § 523(a)(6). The Fourth Circuit, while noting that "willful" means "deliberate or intentional," has explained that "malice" does not require subjective ill-will toward, or a specific intent to injure, the creditor. *In re Stanley*, 66 F.3d at 667. In *Stanley*, the Court determined that the debtor's unauthorized use of a credit line that the bank had mistakenly increased from $8,000 to $80,000 constituted conversion. Although the Court accepted as "probably correct" the bankruptcy judge's factual finding that the debtor had "hopeful intentions" of being able to repay the funds he had converted, *id.* at 668, the Court nevertheless held,

> [T]hat Stanley did not intend for [the bank] to ultimately suffer a loss is legally irrelevant. For conversion to occur, it is not necessary that the property be damaged, but merely that the owner suffer a serious deprivation of the incidents of ownership. Consequently, the proper focus in this case is not on Stanley's "good intentions," but simply on his exercise of dominion and control over funds that he knew belonged to another.

*Id.* at 667. Of course, an honest belief by the debtor that a valid assignment never occurred and that she could stop paying Stone Street if she became financially incapable of doing so would negate a finding of malice, even if that belief was mistaken and perhaps not even reasonable. *See id.* ("[I]t is the debtor's subjective state of mind that is relevant; it does not matter that a 'reasonable debtor' should have known that his act would adversely affect another's rights."); *but see In re Gandara*, 218 B.R. at 812 (debtor's dissatisfaction with chiropractor's services did not excuse conversion of personal injury proceeds that had been validly assigned as payment for his services).

■ A determination as to a debtor's subjective state of mind is ordinarily not appropriate for summary judgment. At the same time, the debtor must point to something in terms of her knowledge and understanding of the facts that would justify a trier of fact in concluding that her conversion of Stone Street's property was not malicious. Here, the only evidence the debtor has specifically identified as supporting her understanding that the assignment was unenforceable is the November 9, 1999, letter from First Colony. As Stone Street points out, however, she did not receive that letter until *after* she had redirected the annuity payments to her own bank account and after she had been sued by Stone Street. Nevertheless, the very structure of the assignment transaction might reasonably have given some intimation that it rested on a shaky, and perhaps even shady, legal foundation. In particular, the arrangement for the deposit of the funds into the special bank account, and the requirement that the debtor execute a "Seller's Affidavit" acknowledging that the Annuity Purchase Agreement might violate restrictions on assignability, might well have suggested to the debtor that a subterfuge was being used to get around an otherwise enforceable restriction on assignment. Accordingly, the court concludes that the factual element of malice remains in genuine dispute, thereby precluding summary judgment as it relates to the prepetition payments converted by the debtor.

*Conclusion*

A separate order will be entered consistent with this opinion determining that Stone Street is the equitable owner of the payments payable to the debtor under the annuity policy issued by First Colony (subject to whatever right Protective has— which the court does not here adjudicate—

to change the beneficiary designation),[13] and that the debtor's liability in tort for any such payments converted after the date of her bankruptcy petition is not affected by her discharge. The motion for summary judgment will be denied to the extent it seeks a determination that the debtor's liability for conversion of prepetition payments is nondischargeable under § 523(a)(6), Bankruptcy Code, and that issue will be reserved for trial.

**13.** Because Protective and First Colony are not parties to this action, the court declines to render an opinion as to whether Protective could be compelled, in an equitable action, to change the beneficiary designation to reflect Stone Street, rather than the debtor, as the payee, or whether First Colony could be compelled, with or without Protective's assent, to send the payments directly to Stone Street. No doubt there may be further litigation over those questions. The court here only adjudicates the equitable rights of Stone Street vis-a-vis the debtor.